## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRIENDS OF ANIMALS,<br>777 Post Road, Suite 205<br>Darien, CT 06820 | )<br>)<br>) | |
| | ) | Civ. No. 15-cv-00653 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAN ASHE, in his official capacity<br>as Director of the<br>U.S. Fish and Wildlife Service,<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington D.C., 20240; and | )<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| SALLY JEWELL, in her official capacity<br>as U.S. Secretary of the Interior,<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington D.C., 20240 | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### I.     INTRODUCTION

1.     Friends of Animals ("FoA") brings this action against the Director of the U.S. Fish and Wildlife Service ("FWS") and the Secretary of the Interior (collectively, "Federal Defendants") to address Federal Defendants' willful refusal to follow the clear dictates of Section 10 of the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA") when processing and issuing permits authorizing the importation of two sport-hunted black rhinoceros trophies.  The applicants apparently seek these permits so

that they can display the trophies in their private collections in the United States.  The permits fail to either enhance the survival of the species or uphold the conservation principles of the ESA, as required by the Act.  As such, Federal Defendants' issuance of the permits was arbitrary, capricious, an abuse of discretion, and contrary to the ESA and its implementing regulations.

2.    FoA asks this Court to find unlawful and set aside the ESA Section 10 permits issued by FWS to Michael Luzich and Corey Knowlton for the importation of personal, sport-hunted black rhino trophies.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). This Court may grant the relief requested under 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706.

4.    An actual, justiciable controversy exists within the meaning of the Declaratory Judgment Act between FoA and Federal Defendants.

5.    Venue lies in the District of Columbia pursuant to 28 U.S.C. 1391(e) because the Defendants have their principal offices in this District; and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

6.    Plaintiff, FRIENDS OF ANIMALS ("FoA"), sues on behalf of itself and its adversely affected members. FoA is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. FoA seeks to free animals from cruelty

and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. FoA engages in a variety of advocacy programs in support of these goals. FoA informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine called *Action Line*, its website, and other reports. In particular, FoA has a long-standing commitment to protecting animals imperiled due to poaching, sport-hunting, and other animal-exploitation markets.

7.      FoA actively works to protect native African species and restore these animals to the wild.  FoA invests considerable resources in its efforts to end trophy hunting of endangered species. FoA publicizes the negative impacts of sports hunting to its members and the public through its quarterly journal *Action Line* and its website. FoA actively opposes hunting black rhinos as well as other endangered species. FoA submitted comments to FWS in opposition to the permit applications at issue here.

8.      FoA has members who travel to, reside, and work in Namibia, and who derive ongoing and lasting recreational, aesthetic, professional, moral, and spiritual benefits from observing black rhinos in their native habitat in Namibia, and knowing that black rhinos live in the wild in Namibia.

9.      FoA members' interests have been harmed and will continue to be harmed by FWS's issuance of permits authorizing the importation of black rhinoceros parts as trophies, such as the permits at issue here.  FoA members also are reasonably concerned that the issuance of import permits for sport-hunted black rhinos, such as the permits at issue here, will increase the world-wide demand for rhino parts and result in increased poaching in Namibia and increased illegal trade.  As a result of increased poaching and

illegal trade, FoA members reasonably fear that their future opportunities to observe black rhinos in the wild in Namibia will be diminished, and their enjoyment when they do observe black rhinos will be decreased.

10.    FoA members also are reasonably concerned that the issuance of the import permits at issue here will lead to future and additional issuances of permits to import sport-hunted black rhino trophy parts to the United States, and thus cause the future, unnecessary deaths of black rhinos among an already critically endangered population.  As FWS Director Dan Ashe recently confirmed in an October 27, 2014 article, U.S. hunters "make up a disproportionately large share of foreign hunters who book trophy hunts in Africa."

11.    Indeed, the permit application at issue here cites a previously issued black rhino ESA Section 10 import permit as precedential support for FWS granting the current applications.  As a result of these likely future black rhino deaths, FoA members reasonably fear that their future opportunities to observe black rhinos in the wild in Namibia will be diminished, and their enjoyment when they do observe black rhinos will be decreased.

12.    The above-described interests of FoA members have been, are being, and unless the relief prayed for herein is granted, will continue to be adversely affected by Defendants' disregard of their statutory duties under the ESA, NEPA and the APA, and by the unlawful harm imposed upon endangered black rhinos that results.  The relief requested in this lawsuit can redress these injuries by ensuring that if FWS decides to issue an ESA Section 10 permit to import a sport-hunted black rhinoceros trophy, such issuances are done in full compliance with applicable statutory and regulatory requirements.

13.    Defendant DAN ASHE is the Director of the U.S. Fish and Wildlife Service.  In this

official position, he is responsible for ensuring that all of FWS's actions comply with the requirements of federal laws.

14.    Defendant SALLY JEWELL, in her official capacity as the Secretary of the Department of the Interior ("Secretary"), has the ultimate responsibility for ensuring that agencies within the Department of Interior, including FWS, comply with the requirements of federal laws.

## IV.    Legal Background

### A.    Purpose and Mandates of the Endangered Species Act.

15.    The purpose of the ESA is to conserve threatened and endangered species and the ecosystems upon which these species depend in the United States and throughout the world. 16 U.S.C. § 1531(b). The Supreme Court recognized that by enacting the ESA, Congress "intended endangered species to be afforded the highest priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174 (1978).

16.    In enacting the ESA, Congress expressly provided authority for listing non-native species that are deemed endangered in their home ranges in other countries.  Congress' decision to include authority for listing of non-native species was based upon a desire to make the United States a leader in protecting species and their ecosystems both domestically and worldwide.

17.    The fundamental method by which the ESA protects endangered species is its aggressive restrictions on take of ESA-listed species, including the prohibition on the importation of such species into the United States.

18.    Congress recognized the need to restrict or prohibit importation of species

because aiding a market for endangered species parts and trophies can threaten the

species' continued survival.

### B.   ESA Section 10 Permit Requirements.

19.   Recognizing the importance of the ESA's take prohibitions, Congress, in Section 10

of the Act, provided for only two narrow exceptions to the ESA's prohibition on importing

endangered species. Only the first of these exceptions is relevant to this action.

20.   Section 10(a)(1)(A) of the ESA allows FWS to issue permits authorizing the

importation of an endangered species "for scientific purposes or to enhance the

propagation or survival of the affected species . . ." (hereinafter, "Survival and Enhancement

Permits").

21.   Under the ESA, FWS may only grant a permit under Section 10 if the agency makes

a finding and publishes its finding in the Federal Register that: (1) the permit was applied

for in good faith; (2) if granted and exercised the permit will not operate to the

disadvantage of such endangered species; and (3) that issuance of the permit will be

consistent with the purposes and policy set forth in Section 2 of the ESA.

22.   Among other things, Section 2 of the ESA states that it is the purpose of the Act to

provide a program for the conservation of endangered species, and that it is the policy of

Congress that all federal agencies seek to conserve endangered species.

23.   The ESA defines the terms conserve, conserving and conservation as:

> to use and the use of all methods and procedures which are necessary to bring
> endangered species and threatened species to the point at which measures
> provided [in the ESA] are no longer necessary.  Such methods and procedures
> include, but are not limited to, all activities associated with scientific resources
> management such as research, census, law enforcement, habitat acquisition
> and maintenance, propagation, live trapping, and transplantation, and, in the
> extraordinary case where population pressures within a given ecosystem

cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3).

### C.  FWS's Regulatory Requirements for ESA Section 10 Permits

24.  By regulation, FWS has further defined its obligations under Section 10 of the ESA

by requiring that, when deciding whether to issue a permit, the agency must consider all of

the following permit issuance criteria:

(i)      whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii)     the probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii)    whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv)     whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v)      the opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi)     whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.22.

25.  By regulation, FWS is prohibited from issuing a permit if the applicant has failed to

disclose material information required for the agency to adequately consider the issuance

criteria listed above.

26.  By regulation, FWS is prohibited from issuing a permit if the applicant has failed to

demonstrate a valid justification for the permit and a showing of responsibility.

27.   By regulation, FWS is prohibited from issuing a permit if the issuance of the permit would threaten a wildlife population.

### D.  National Environmental Policy Act

28.   NEPA is our nation's basic charter for environmental protection.

29.   Congress enacted NEPA for two central purposes.  First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting.  Second, Congress sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of proposed agency action.

30.   NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with that action.

31.   Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed environmental impact statement ("EIS") that discusses, among other things: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action."

32.   The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment."  The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

33.   Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity."  The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected

interests, and the locality."  Intensity "refers to the severity of the impact" and requires federal agencies to consider several factors including: impacts of the action, unique characteristics of the geographic area, the degree to which environmental effects of the proposed action are highly controversial; the degree to which the action may have a precedential effect; the degree to which possible effects of the action are highly uncertain or involve unique or unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on threatened species or their critical habitat.

34.   Agencies may prepare an Environmental Assessment ("EA") to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

35.   An EA must take a "hard look" at the potential consequences of its actions and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment.

36.    If the agency decides the impacts are not significant, it must supply a convincing statement of reasons why, and make its finding of no significant impact available to the public.

37.   A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial.

38.   Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action.  To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts.

## V.      FACTUAL BACKGROUND

### A. Black Rhinoceros (*Diceros bicornis*)

39.   The black rhinoceros or hook-lipped rhinoceros (*Diceros bicornis*) is a species of rhino native to eastern and southern Africa. Although the rhinoceros is referred to as black, its colors vary from brown to grey. The black rhino is a large species, and can weigh up to 3,000 pounds.

40.   The typical lifespan of a black rhino is 30 to 35 years. Normally, black rhinos give birth to one calf at a time, after a 15-17 month gestation period. Males are solitary, while females may be accompanied by their single dependent young for up to four years.

41.   The black rhinoceros has two horns, and occasionally a third small posterior horn. The species is distinguished from the white rhino by a prehensile upper lip (hence the alternative name of hook-lipped rhino), which it uses to feed on twigs of woody plants and a variety of herbaceous plants.

42.   The black rhino species has drastically decreased during the twentieth century. The population may have numbered as many as 850,000 individuals, but by 1960 the species was reduced to 100,000, and by 1995 only 2,410 black rhinos remained. One international non-governmental organization (TRAFFIC) reports that the 97% decrease in the African black rhino population [between 1960 and 1995] represents one of the most dramatic crashes of any large mammal species in recent history.

43.   The population has since risen to an estimated 5,550 black rhinos in December 2012. However, of the 11 States with black rhino populations, the total population in six of those States is fewer than 30 individuals.  The International Union for Conservation of Nature ("IUCN") lists black rhinos as "critically endangered."

44.   The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") listed the black rhino in 1975 under Appendix II, designated for species that are not necessarily currently threatened with extinction but that may become so unless trade is closely controlled.  In 1977, the black rhino was upgraded to CITES Appendix I, a designation reserved for species that are the most endangered among CITES-listed animals.  In 1980, FWS listed the black rhino as endangered under the ESA.

45.   Up until 2004, CITES did not allow for the import/export of any sport hunted black rhino trophies.  In 2004, CITES authorized sport hunters to take five black rhinos each year from Namibia and South Africa, for a total of 10 sport-hunted black rhinos per year.  Since sport hunting for black rhinos was authorized by CITES, including the exportation of sport-hunted trophies outside of the rhinos' countries of origin, poaching in Namibia and South African has increased.

46.   Both sport-hunters and poachers target black rhinoceros. While great emphasis is rightfully placed on the threat to black rhinos from modern day poaching, the impact of hunting rhinos for sport over the past century or more cannot be overstated. Sport-hunting was the primary reason for the original decline in the population of black rhinos in the wild. The continued status of the rhino as one of the so-called African big five sport trophies (rhinos, lions, elephants, tigers, and water buffalos) continues to undermine conservation efforts by effectively commodifying the species and decreasing the stigma attached to the killing of rhinos. Poaching of rhinoceroses for various cultural uses—ornamental, medicinal and as trophies—is on the rise. The latest IUCN assessment on the trends in rhino poaching shows increased poaching across the range of both white and black rhinos over the past five years.

47.    Evidence suggests that the rise in poaching is related to moves by many African countries to legalize some sport-hunting of the species. For example, South Africa, home to the largest black rhino population in the world, received CITES permission to sell permits for trophy hunted rhinos in 2004. The country has since seen a marked rise in illegal rhino poaching, with some reports indicating that rhino poaching has increased 9,300% since 2007. In 2011, poachers killed 448 rhinos (black and white species) in South Africa. The next year saw an almost 50% increase in rhino poaching, with the total rising to 668 in 2012. Recent reports show that South Africa lost 1,004 rhinos due to poaching in 2013, and 1,215 rhinos in 2014.

48.    Likewise, in 2004, CITES parties also approved a request for Namibia to sell permits for trophy hunted black rhinos.  Since this approval, Namibia's rhino populations are increasingly becoming a target for poaching. In 2014 alone, poachers killed at least 24 rhinos in Namibia.

49.    While sport hunting in Namibia is purportedly well-regulated and managed, relative to sport hunting in other African countries, sport hunts there can go horribly wrong. For example, in 2013, one American sport hunter, accompanied by a professional guide and two Namibian ministry officials reportedly accidentally shot and killed the only female rhino cow in Mangetti National Park, Namibia.

50.    An increasing number of studies and reports indicate that the creation of a dual market of legal and illegal trade by allowing the importation of endangered animal trophies is inconsistent with Section 2(b) of the ESA as it could increase trade in laundered animals, which are hunted and killed illegally.

51.    FWS has previously acknowledged that the legal trade of a subpopulation of an

ESA-listed species can have detrimental effects on the species as a whole, by increasing demand in the illegal market because prices for illegally-caught animals can go up as legal demand increases.

### B.   ESA Section 10 Permits for Namibian Black Rhinos

52.   On or around April 9, 2014, Mr. Corey Knowlton submitted an application to FWS for a permit to import a sport-hunted trophy of a black rhino from Namibia, the hunt for which has not yet occurred.  On or around April 10, 2014, Mr. Michael Luzich submitted an application to FWS for a permit to import a sport-hunted trophy of a black rhino Mr. Luzich killed in Namibia in 2013 (hereinafter referred to collectively as "Knowlton-Luzich Applications").

53.   FWS published notice of the Knowlton-Luzich Applications in the Federal Register on November 6, 2014. 79 Fed. Reg. 65980.

54.   On December 8, 2014, FoA submitted comments regarding the Knowlton-Luzich Applications and urged FWS not to approve the permits.

55.   On March 26, 2015, FWS sent an email to FoA providing 10-day notification of FWS's intent to issue an ESA Section 10 permit to Mr. Luzich for the import of a personal sport-hunted black rhino trophy taken in Namibia in 2013.  *See* Exhibit 1 (attached and incorporated by reference).  On April 7, 2015, FWS sent an email to FoA providing 10-day notification of FWS's intent to issue an ESA Section 10 permit to Mr. Knowlton for the import of a personal sport-hunted black rhino trophy taken in Namibia.  *See* Exhibit 2 (attached and incorporated by reference).

56.   Upon information and belief, on or around April 6, 2015, FWS issued Mr. Luzich an ESA Section 10 take permit to import into the United States from Namibia a black

rhinoceros he killed during a sport-hunting trip in 2013.

57.    Upon information and belief, on or around April 20, 2015, FWS issued Mr.
Knowlton an ESA Section 10 take permit to import into the United States from Namibia a
sport-hunted black rhinoceros trophy.

58.    The Knowlton-Luzich Applications failed to meet the statutory requirements to
obtain a Survival and Enhancement Permit, and as a result FWS's approval of the
applications and issuance of the ESA Section 10 permits are arbitrary, capricious, an abuse
of discretion, and violate the law.

59.    The ESA Section 10 permits were not applied for in good faith as a means to
enhance the propagation or survival of endangered black rhinoceros.  Neither Mr.
Knowlton nor Mr. Luzich submitted any information, such as resumes or other credentials,
to demonstrate that they have a legitimate intention—whether for scientific, commercial,
or personal reasons—to protect black rhinos in the wild or to contribute to the species
recovery. The Knowlton-Luzich Applications did not indicate that the applicants have any
special knowledge about, or training pertaining to, rhino conservation and recovery. Nor
did the Knowlton-Luzich Applications include any specific history related to the applicants'
interest in endangered species protection generally, or past efforts pertaining to rhino
protection specifically.

60.     The Knowlton-Luzich Applications did not contain information regarding how
issuance of the permits would be consistent with the purposes and policies of the ESA.

61.    The Knowlton-Luzich Applications, and FWS's subsequent decision to issue the
permits based on those applications, fail to address whether the permits might also operate
to the disadvantage of black rhino populations in Namibia and elsewhere, as they promote

hunting and international transport of a critically endangered species.

62.    The Knowlton-Luzich Applications contain no information to show that the permits are needed for an extraordinary case in which regulated taking is necessary because no other available method exists to conserve the species.

63.    The Knowlton-Luzich Applications, and FWS's subsequent decision to issue the permits based on those applications, failed to address: (1) the probable direct and indirect effect that issuing the permits would have on the wild populations of the wildlife sought to be covered by the permits; (2) whether the permits, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population of the species to be covered by the permits; (3) whether the purpose for which the permits were required would be likely to reduce the threat of extinction facing the species to be covered by the permits; and (4) whether the expertise, facilities, or other resources available to the applicant were adequate to successfully accomplish the objectives stated in the applications.

64.    The Knowlton-Luzich Applications did not show that the applicants' requested activity, importing the sport-hunted trophies, furthers any of the purposes set forth in ESA Section 2(b): that the permits are conserving the ecosystems on which these listed animals depend; are providing a program for their conservation; and are helping to achieve the purposes of treaties and conventions spelled out in ESA Section 2(a).

65.    At most the Knowlton-Luzich Applications simply provide that the money spent obtaining a sport-hunting permit to kill the animal was or will be paid to the Namibian Game Products Trust Funds.

66. The ESA does not provide for making payment for the taking of an endangered species in lieu of demonstrating that an ESA Section 10 permit is necessary to conserve the species.

67. The Knowlton-Luzich Applications contain no information that, even if lawful, the money paid for obtaining the sport-hunting permits is actually conserving black rhinos.

68. FWS did not publish in the Federal Register its finding that the Knowlton-Luzich permits met the statutory requirements set forth in ESA Section 10(d), 16 U.S.C. § 1539(d).

69. There is no evidence that FWS prepared an EA or EIS in conjunction with its issuance of the Knowlton-Luzich permits.

## VI.     FIRST CAUSE OF ACTION (Violation of APA: Illegal Issuance of ESA Section 10 Permits to Mr. Luzich and Mr. Knowlton)

70. FoA hereby incorporates all allegations contained in paragraphs 1 through 69.

71. By approving the Knowlton-Luzich Applications and issuing permits to import sport-hunted black rhinoceros trophies, Federal Defendants are acting in a manner that is arbitrary, capricious, an abuse of discretion, and contrary to the law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

## VII.     SECOND CAUSE OF ACTION (Violation of NEPA)

72. FoA hereby realleges and incorporates paragraphs 1 through 71.

73. Because FWS's issuance of the Knowlton-Luzich permits to import sport-hunted black rhinoceros trophies are major Federal actions that have potential environmental consequences, are highly controversial, and have unknown risks, FWS's decision not to prepare an EA or EIS was arbitrary, capricious, an abuse of discretion and contrary to NEPA and its implementing regulations.  *See* 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)(A).

## VIII.    PRAYER FOR RELIEF

FoA respectfully request that this Court enter judgment providing the following relief:

1.    Declare that Federal Defendants violated the APA and the ESA by issuing ESA Section 10 permits to Mr. Luzich and Mr. Knowlton to import black rhinoceros sport-hunted trophies;

2.    Declare unlawful and set aside Mr. Luzich's and Mr. Knowlton's ESA Section 10 Survival and Enhancement permits;

3.    Declare that Federal Defendants have violated NEPA by failing to conduct any environmental review or prepare an EA or EIS for the ESA Section 10 Survival and Enhancement permits;

4.    Enjoin Federal Defendants from issuing any ESA Section 10 Survival and Enhancement permits for black rhinos, unless and until Federal Defendants have complied with all applicable laws;

5.    Award FoA costs, including reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6.    Grant FoA such further relief that the Court deems just and proper.


Dated:  April 29, 2015                    Respectfully Submitted,

                                          s/ Jennifer Barnes
                                          Jennifer Barnes (DC Bar # CO0056)
                                          Associate Attorney
                                          Friends of Animals
                                          Western Region Office
                                          7500 E. Arapahoe Rd., Ste. 385
                                          Centennial, CO
                                          720-949-7791
                                          jenniferbarnes@friendsofanimals.org

s/ Michael Harris
Michael Ray Harris (DC Bar #CO0049)
Director, Wildlife Law Program
Friends of Animals
Western Region Office
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO
720-949-7791
michaelharris@friendsofanimals.org

s/ Kevin M. Cassidy (*pro hac vice* to be submitted)
Kevin M. Cassidy (MA BBO# 681301)
Senior Staff Attorney
EARTHRISE LAW CENTER
P.O. Box 445
Norwell, MA  02061
Tel: (781) 659-1696
Email: cassidy@lclark.edu
Fax: (503) 768-6642

# Exhibit 1

**From:**     Moore, Mike
**To:**       jpierce@aldf.org; Michael Harris; DelciannaW@petaf.org; afrostic@humanesociety.org
**Subject:**   Ten day notice of the intent by the U.S. Fish and Wildlife Service to issue a permit to Michael S. Luzich, PRT-33743B.
**Date:**      Thursday, March 26, 2015 10:08:05 AM

---

As per your request under 50 CFR 17.22(e)(2), you are being given a 10-day notification of the Service's intent to issue an ESA /CITES permit to Mr. Michael Luzich, for the import of a personal sport-hunted black rhino trophy taken in Namibia in 2013.

In addition, while we are prepared to issue a permit to Mr. Corey D. Knowlton (PRT-33291B), for the import of a black rhino trophy to be taken in Namibia, the Service needs confirmation that the money for this hunt has been transferred to the Government of Namibia's Game Products Trust Fund. Once confirmation of this transfer has been received by the Service, we will again contact you giving a 10-day notification of our intent to issue Mr. Knowlton's permit.

If you have any questions, please feel free to contact our office.

Best regards

# Exhibit 2

| | |
|---|---|
| **From:** | Moore, Mike |
| **To:** | Jeff Pierce; Michael Harris; DelciannaW@petaf.org; afrostic@humanesociety.org |
| **Subject:** | Ten day notice of intent by the U.S. Fish and Wildlife Service to issue a permit to Corey D. Knowlton, PRT-33291B. |
| **Date:** | Tuesday, April 7, 2015 8:27:39 AM |

As per your request under 50 CFR 17.22(e)(2), you are being given a 10-day notification of the Service's intent to issue an ESA/CITES permit to Mr. Corey Knowlton, for the import of a personal sport-hunted black rhino trophy to be taken in Namibia.

If you have any questions, please feel free to contact our office.

Best regards