MICHAEL RAY HARRIS (DC Bar # CO0049)
JENNIFER BARNES (DC Bar # CO0056)
Friends of Animals
Western Region Office
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO
Tel: 720-949-7791
michaelharris@friendsofanimals.org
jenniferbarnes@friendsofanimals.org

KEVIN M. CASSIDY (DC Bar # MA0021)
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
Tel: 781-659-1696
Fax: 503-768-6642
cassidy@lclark.edu

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS and ZIMBABWE CONSERVATION TASK FORCE )<br><br>Plaintiffs, )<br><br>v. )<br><br>DAN ASHE, *et al.*, )<br><br>Defendants, )<br><br>and )<br><br>CONSERVATION FORCE, *et al.* )<br><br>Defendant-Intervenors. ) | Civ. No. 15-cv-00653-ABJ<br><br>**Plaintiffs' Consolidated Opposition to Defendants' and Intervenors' Motions to Dismiss** |

**Table of Contents**

I.     Introduction ........................................................................................................1

II.    Factual Background .............................................................................................3

    A.    The decline of black rhinos ...................................................................3

    B.    Trophy-hunting and wildlife conservation .............................................5

    C.    Defendants' issuance of permits authorizing the import of black rhino-hunting trophies ....................................................................................................6

III.    Legal background and standards .........................................................................9

IV.    Plaintiffs' allegations are sufficient to establish standing at the motion to dismiss stage ..................................................................................................................12

    A.    Plaintiffs have alleged injury-in-fact ...................................................13

    B.    Plaintiffs have alleged causation ..........................................................17

    C.    Plaintiffs have alleged redressability ...................................................24

    D.    Plaintiffs have standing based on Defendants' violation of Plaintiffs' procedural rights .........................................................................................................28

V.    Intervenors' zone of interests argument is meritless .........................................30

VI.    Plaintiffs are not subject to the ESA's 60-day notice requirement ...................33

VII.    The Motion to Dismiss the Third Cause of Action Should be Denied. ...............36

    A.    Plaintiffs' third cause of action challenges reviewable final agency ...................36

        1.    Defendants' permits and policy represent the consummation of the agency's decision-making process. ...................................................................37

        2.    Defendants' policy authorizing hunters to import black rhino hunting trophies from Namibia determines the rights of those interested in hunting and importing rhinos ...............................................................................39

        3.    Defendants' and Intervenors' reliance on *PETA* is misplaced ...............39

B.      Defendants' policy is challengeable as it is the source of individual permitting decisions.............................................................................................................41

VIII.   Conclusion ........................................................................................................................43

# Table of Authorities

Page(s)

**Cases**

*Adam v. Saenger,* 303 U.S. 59 (1938)..........................................................................12

*Allen v. Wright*, 468 U.S. 737 (1984) .........................................................................12

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*,
    659 F.3d 13 (D.C. Cir. 2011) ..............................................................................32

*Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, .....
    317 F.3d 334 (D.C. Cir. 2003) ............................................................................13

*Americanus v. Wildlife Services*,
    No. CV–03–1606–HU, 2004 WL 2127182 (D. Or. Sept. 23, 2004) ................................27

*Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) ....................................................32

*Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998)...............................22

*Baltimore Gas & Elec. Co. v. Natural Resource Def. Council*,
    462 U.S. 97 (1983)............................................................................................29

*Barr v. Clinton,* 370 F.3d 1196 (D.C. Cir. 2004).......................................................11

*Born Free U.S.A. v. Norton*, 278 F. Supp. 2 5 (D.D.C. 2003) .................................28, 29

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................ *passim*

*Cary v. Hall*, No. C 05–4363 VRW, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006) ..................16

*City of Houston. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421 (D.C. Cir. 1994) .....................43

*Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663 (D.C. Cir. 1987)...............................25

*Conservation Force v. Salazar*, 851 F. Supp. 2d 44 (D.D.C. 2012)...........................................35

*Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*,
    788 F.3d 312 (D.C. Cir. 2015) ...........................................................................31

*C-SPAN v. F.C.C.*, 545 F.3d 1051 (D.C. Cir. 2008)....................................................11

*Ctr. for Native Ecosystems v. Salazar*,
    711 F. Supp. 2d 1267 (D. Colo. 2010)................................................................36

*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008)............................................2, 26

*Del Monte Fresh Produce v. United States*,
    706 F. Supp. 2d 116 (D.D.C. 2010) .................................................................37

*Doe v. U.S. Dept. of Justice*, 753 F.2d 1092 (D.C. Cir. 1985)........................................10

*Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012 (D.C. Cir. 1997) ...............................11

*Envtl Def. Fund, Inc. v. Massey*, 986 F.2d 528 (D.C. Cir. 1993) ...................................28

*Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961).........................................................12

*Fed. Forest Res. Coal. v. Vilsack*,
    No. 12–1333 (KBJ), 2015 WL 1906022 (D.D.C. Apr. 28, 2015) .....................42

*Fla. Audubon Soc. v. Bentsen*, 94 F.3d. 658 (D.C. Cir. 1996).........................................30

*Friends of Animals v. Jewell*,
    No. 13–cv–02034 JAM–CKD, 2014 WL 3837233 (E.D. Cal. Aug. 1, 2014)..................15

*Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. June 22, 2009) .............................15

*Fund for Animals v. Babbitt*, 2 F. Supp. 2d 570 (D. Vt. 1997).........................................27

*Fund for Animals v. Lujan*, 962 F.2d 1391 (9th Cir. 1992) ..........................................16

*Fund for Animals v. Norton*, 322 F.3d 728 (D.C. Cir. 2003).................................21, 39

*Fund for Animals v. Norton*, 295 F. Supp. 2d 1 (D.C.C. July 31, 2003) ................................21, 25

*General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375 (1982).....................................14

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ..................................................32, 35

*Goat Ranchers of Or. v. Williams*,
    No. 08–97–ST, 2009 WL 883581 (D. Or. March 30, 2009)...............................27

*Grocery Mfr. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012).........................................18

*GSS Group Ltd. v. Nat'l Port Authority*, 680 F.3d 805 (D.C. Cir. 2012) ......................12

*Gunpowder Riverkeeper v. Fed. Regulatory Comm'n*, No. 14–1062, 2015 WL 4450952
    (D.C. Cir. July 21, 2015)....................................................................33

*Lexmark Int'l Inc. v. Static Control Components*, 134 S.Ct. 1377(2014)..........................30, 31, 32

*Humane Soc'y of the U.S. v. Hodel,* 840 F.2d 45 (D.C. Cir. 1988) ...............................................16

*Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85 (D.D.C. 2009)...........................22

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .................................................12

*Larson v. Valente*, 456 U.S. 228 (1982) ........................................................................................25

*Lexmark Int'l Inc. v. Static Control Components*, 134 S.Ct. 1377 (2014)..............................30, 31

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)...................................................................10

*Lujan v. Defenders of Wildlife* ("*Defenders*"), 504 U.S. 555 (1992).................................... *passim*

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ............................................................ *passim*

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ............................................................29

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...............................................................................26

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) .....................................................................................32

*M & T Mortg. Corp. v. White*,
    No. 04-CV-4775-NGGVVP, 2006 WL 47467 (E.D.N.Y. Jan. 9, 2006) ..........................37

*NAACP v. U.S. Dep't of Hous. & Urban Dev.*, 817 F.2d 149 (1st Cir. 1987)...............................37

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005) ........................................................................36, 37, 38

*Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101 (D.D.C. 2013) .............................................41

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004).............11, 22, 23

*Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059 (9th Cir. 2002)........................................41

*Natural Res. Def. Council v. EPA,* 542 F.3d 1235 (9th Cir. 2008)................................................12

*Natural Res. Def. Council v. U.S. Dep't of Navy*, No. CV-01-07781 CAS (RZX)
    2002 WL 32095131 (C.D. Cal. Sept. 17, 2002) ................................................................28

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)....................................................37, 38

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ......................................................39, 42

*Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2011) ..............................................................31, 32

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ....................................37, 41

*People for the Ethical Treatment of Animals v. FWS*,
    59 F. Supp. 3d 91 (D.D.C. 2014) ..................................................................................39, 40

*Robishaw Eng'g, Inc. v. United States*, 891 F. Supp. 1134 (E.D. Va. 1995)................................38

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006) ..................................................................11

*Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29 (D.C.C. 2014)..................................................17, 18

*Safari Club Int'l v. Jewell*, No. 14–0670-RCL, Order, Dkt. 62 (Mar. 12, 2015) ................. *passim*

*Salmon Spawning and Recovery Alliance v. U.S. Customs and Border Prot.*,
    550 F.3d 1121 (Fed. Cir. 2008)..........................................................................................24

*Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014) ......................................................................13

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ................................................................................20

*Sierra Club v. Peterson*, 288 F.3d 559 (5th Cir. 2000)..................................................................41

*Sierra Club v. Salazar*, 961 F. Supp. 2d 1172 (W.D. Wash. 2013)................................................35

*State of N.Y. v. Thomas,* 613 F. Supp. 1472 (D.D.C. 1985)...........................................................12

*Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002).......................................30

*Swan View Coal. v. Dep't of Agric.*, 39 F. Supp. 2d 42 (D.D.C. 1999)........................................42

*Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42 (D.C. Cir. 1994)..........................................................11

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................................................10

*Watt v. Energy Action Educational Foundation*, 454 U.S. 151 (1981) .........................................14

*WildEarth Guardians v. USDA*,
    No. 13-16071, 2015 WL4604142 (9th Cir. Aug. 3, 2015) ...............................................27

**Statutes and Regulations**        **Page(s)**

16 U.S.C. § 1531(b) ........................................................................................................................32

16 U.S.C. § 1539(a)(1)(A) .................................................................................32

16 U.S.C. § 1540(g)(1)(A) .................................................................................34

16 U.S.C. § 1540(g)(1)(B) .................................................................................34

16 U.S.C. § 1540(g)(1)(C) .................................................................................34

16 U.S.C.§ 1540(g)(2)(C) ..................................................................................34

40 U.S.C. § 1508.27(b)(9) .................................................................................33

42 U.S.C. § 4332(2)(C)......................................................................................29

**Other**                                                                                        **Page(s)**

40 C.F.R. § 1508.4 ...............................................................................................

40 C.F.R. § 1508.18 ...........................................................................................29

45 Fed. Reg. 47,352. ...........................................................................................4

78 Fed. Reg. 27,255 .............................................................................................7

80 Fed. Reg. 28,297 .............................................................................................8

CITES, 27 U.S.T. 1087; T.I.A.S. No. 8249 (Mar. 3, 1973), Art. II(1) ...........................4

Federal Rule of Evidence 201 ..............................................................................4

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' AND
INTERVENORS' MOTIONS TO DISMISS**

## I.      Introduction.

Armed with permission from the United States Fish and Wildlife Service ("FWS"), the

FWS Director, and the U.S. Secretary of Interior (collectively, "Defendants") to import a trophy

for his personal collection—and a high-powered 500 Nitro Express rifle—on May 18, 2015,

Corey Knowlton shot and killed an endangered black rhinoceros in Namibia. This hunt may very

well not have occurred if Defendants had complied with Section 10 of the Endangered Species

Act ("ESA"), which requires that any "take" of an endangered species will work to enhance, not

diminish, the overall survival of the species in the wild. Instead Defendants, as they routinely do

for American trophy hunters, issued Knowlton (as well as Michael Luzich) a permit to import a

black rhino-hunting trophy—presumably for display among their extensive, private collections—

on the debunked belief that trophy-hunting generates enough money to allow African

governments to protect the animals in the wild from other threats, such as poaching and habitat

destruction. In reality, all recent indicators—from on the ground observation to scientific

research—demonstrate that trophy-hunting does nothing but undermine the conservation of these

animals by increasing demand for them in both the legal and illegal markets.

Defendants know that their Section 10 findings are unjustified, and as such would rather

not produce the underlying record to Friends of Animals ("FoA"), Zimbabwe Conservation Task

Force ("ZCTF" and, collectively with FoA, "Plaintiffs"), or to this Court. To avoid that prospect,

Defendants ask this Court to dismiss the entirety of Plaintiffs' case for lack of standing or,

alternatively, if the Court finds Plaintiffs have standing, to dismiss Plaintiffs' Third Cause of

Action for failure to state a claim. *See generally,* Federal Defendants' Motion to Dismiss, Dkt.

17 (hereafter "Def. Br."). Intervenors' motion to dismiss for lack of jurisdiction asks for similar

results. *See generally,* Memorandum of Law in Support of Motion to Dismiss for Lack of

Jurisdiction, Dkt. 18–1 (hereafter "Int. Br."). To support their arguments, both Defendants and

Intervenors explain their theory that killing endangered black rhinos helps the survival of the species. *See* Def. Br. at 5–7; Int. Br. at 3–7. This Court should not be fooled by Defendants' and Intervenors' attempts to pass off any purported benefits from killing black rhinos as benefits that stem from the import of black rhino-hunting trophies. Indeed, Defendants and Intervenors have not identified any benefits to the species that stem solely from Defendants' decisions to allow hunters to import black rhino-hunting trophies.

But the question of whether Defendants' decision to issue import permits for black rhino-hunting trophies complies with the ESA places the cart before the horse. That is a merits question, which Plaintiffs will be fully prepared to debate once Defendants make the entire administrative record available. This Court should not require Plaintiffs to prematurely demonstrate that they will prevail on the merits in order to show they have standing; especially since, as explained below, Plaintiffs' allegations of standing are more than sufficient for the motion to dismiss stage. In fact, when evaluating whether Plaintiffs have standing, this Court must assume that Plaintiffs will succeed on the merits. *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (noting that "'in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims'")).

Ultimately, this Court should deny Defendants' and Intervenors' motions to dismiss because Plaintiffs and their members have suffered harm as a result of Defendants' permit issuances. As discussed below, Plaintiffs have members—including John Grobler, who lives in Namibia and has observed and written about rhinos for much of his adult life—who enjoy observing black rhinos in the wild, who care deeply about the protection and preservation of the species, and whose interests are harmed when black rhinos are hunted and killed. Defendants' decision to allow American hunters to import black rhino trophies leads to the hunting and the deaths of black rhinos. If Defendants ceased issuing import permits for black rhino-hunting

trophies from Namibia, fewer Americans would hunt and kill black rhinos, and thus more black rhinos would be alive for Plaintiffs' members to observe and enjoy. Accordingly, this Court can redress Plaintiffs' injury by invalidating the Knowlton and Luzich permits and enjoining Defendants from issuing any further permits to import black rhino-hunting trophies, unless and until Defendants have complied with all applicable laws.[1]

In addition to demonstrating Article III standing to proceed with this action, Plaintiffs' brief addresses Defendants' motion to dismiss for failure to state a claim and Intervenors' additional meritless arguments for dismissal based on lack of jurisdiction. For all of the reasons discussed below, this Court should deny the motions to dismiss and allow this case to proceed to the merits.

## II.    Factual Background.

### A. The decline of black rhinos.

Black rhinos are magnificent animals. Weighing up to 3,000 pounds, they are large animals and can live for more than 30 years. *See* First Amended Complaint for Injunctive and Declaratory Relief, Dkt. 5 (hereafter "Complaint") at ¶¶ 49–50. Because of these traits, many people—including members of Plaintiff organizations—take great enjoyment from seeing black rhinos in the wild, care deeply about the future of black rhinos, and have dedicated portions of their careers towards protecting the species from extinction. *See* Complaint at ¶¶ 6–13.

At the turn of the twentieth century, the black rhino population may have numbered as many as 850,000 individuals worldwide, but by 1960 the species was reduced to 100,000 individuals, and by 1995 only 2,410 black rhinos remained. *See* Complaint at ¶ 52. The population has since risen to an estimated 4,838 black rhinos as of December 2012; of those,

---

[1] Intervenors criticize FoA's anti-hunting position in their brief; but while FoA may as a policy not approve of hunting animals—and while in FoA's ideal world no animal hunting would occur—the relief Plaintiffs seek in this lawsuit is not to end hunting; rather, they seek to enjoin Defendants from issuing import permits for black rhino-hunting trophies unless and until Defendants comply with the law.

approximately 1,769 live in Namibia. *See id.* at ¶ 52.

Due to this drastic decline, the international community, including the United States, began taking steps to protect the species. In 1980, FWS listed the black rhino as endangered under the ESA. *See* Complaint at ¶ 54; *see also* 45 Fed. Reg. 47,352 (July 14, 1980). In 1977, member-states of the Convention on International Trade in Endangered Species ("CITES") listed black rhinos on Appendix 1, a designation reserved for most endangered CITES-listed species and one that results in significant trade restrictions on black rhinos and their parts. *See* Complaint at ¶ 54; *see also* CITES, 27 U.S.T. 1087; T.I.A.S. No. 8249 (Mar. 3, 1973), Art. II(1).

Defendants and Intervenors attempt to portray Namibia's efforts to protect its black rhino population as a success story. And, indeed, the Namibian population has reportedly significantly risen since the early 2000s—from an estimated 1,134 individuals in 2004 to approximately 1,769 individuals by December 2012. *See* Complaint. at ¶ 53; *see also* Namibia, Conservation of Rhinoceros in Namibia, CoP13 Inf. 21, at 1 (document submitted by Namibia to CITES in 2004).[2] Of course, this is still a tiny fraction of the black rhino population that existed in Namibia just 55 years ago, and an even smaller fraction of the worldwide population of black rhinos that lived merely a century ago. *See* Complaint at ¶ 52.

Despite this modest increase in the Namibian black rhino population, the future of the species is still highly uncertain. Poaching of black rhinos is on the rise in many African range countries, including Namibia. *See id.* at ¶¶ 55–58. Between 2006 and February 20, 2013, poachers killed only five rhinos (potentially including black rhinos and other rhino species) in Namibia. *See* CITES Secretariat, Rhinoceroses, CoP16 Inf. 51, at 4, https://cites.org/sites/default/files/eng/cop/16/inf/E-CoP16i-51.pdf. In contrast, according to news reports, poachers killed at least 24 rhinos in Namibia in 2014 and at least 42 rhino deaths were reported in Namibia

---

[2] This Court can take judicial notice of this and other CITES documents cited by Plaintiffs throughout this brief. *See* Federal Rule of Evidence 201 (stating that a court can take judicial notice of adjudicative facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

in the first part of 2015, including 31 carcasses discovered in Etosha National Park between April 8 and 17, 2015. *See* Complaint at ¶ 58.[3] Neither Defendants nor Intervenors mention this increase in rhino poaching in their briefs; nor, based on the partial administrative record that Defendants have produced to Plaintiffs, does it appear that Defendants considered this rising trend in black rhino poaching in Namibia when deciding whether to issue the import permits to Luzich and Knowlton. *See* March 25, 2015 Enhancement Finding for the import of a Sport-hunted Black Rhino trophy taken in Namibia during 2013 (PRT-33743B), Dkt. 17–1 (hereafter "Luzich Enhancement Finding"), at 4 (stating that "[t]here has been no indication that poaching as [*sic*] impacted the species within Namibia over the last 2 years"); April 6, 2015 Enhancement Finding for the import of a Sport-hunted Black Rhino trophy taken in Namibia during 2013 (PRT-33291B), Dkt. 17–2 (hereafter "Knowlton Enhancement Finding"), at 4 (same).

### B. Trophy-hunting and wildlife conservation.

The basic premise offered by proponents of trophy-hunting endangered animals such as the black rhino is that the money raised through trophy-hunting is the best chance these species have to survive in the wild. *See* Def. Br. at 11–12; *see also* Declaration of Johnny Rodrigues in Support of Plaintiffs' Consolidated Opposition to Defendants' and Intervenors' Motions to Dismiss ("Rodrigues Dec.") at ¶ 8. In their view, hunting money sent to Africa will ensure that these species continue to survive in the wild. Unfortunately, the notion of conservation by killing ignores reality: while legal trophy-hunting raises money in the short-term, it reduces the overall survivability of the species in the wild in the long-term. *See* Declaration of Priscilla Feral in Support of Plaintiffs' Consolidated Opposition to Defendants' and Intervenors' Motions to Dismiss ("Feral Dec.") at ¶¶ 15–25. In fact, research shows that trophy-hunting creates market

---

[3] *See also* Namibia: Poachers Slaughter 95 Black Rhinos, allAfrica (June 5, 2015), http://allafrica.com/stories/201506051134.html (last visited Aug. 25, 2015); Namibia: More Inroads Made in Fight Against Poaching, allAfrica (July 13, 2015), http://allafrica.com/stories/201507131574.html (last visited Aug. 25, 2015) (reporting that the Namibian Minister of Environment and Tourism announced that 54 rhinos were poached in Etosha National Park in May 2015).

conditions that increase demand for these species, resulting in their further demise. *See id.* at ¶ 19.

Indeed, trophy-hunting reduces the stigma associated with the killing of endangered animals. For example, authorizing the killing and export of trophy-hunted rhinos under the guise of "conservation" can falsely suggest that rhino populations are being protected and/or that the species is recovering and no longer critically endangered. *See id.* at ¶ 21. At the same time, it reinforces the belief that rhino parts as trophies and other uses should be highly desired. *Id.* Similarly, legal hunting also can directly undermine attempts to stop illegal poaching by creating opportunities to "launder" illegally killed animals. *See id.* at ¶¶ 17–18. Poached animals and their parts can be laundered by identifying them as products of legal trophy-hunting. Even in the age of advanced crime fighting technology, it remains difficult, if not impossible, for law enforcement to distinguish between a legally-killed and an illegally-killed animal or animal part once it is in the market. *See id.* at ¶ 14.

The problem with using trophy-hunting as a tool to protect African wildlife is not a myth. Studies and in-the-field observations show that an increase in the number of legally killed animals is directly correlated to an increase in demand for that species and, thus, poaching. *See* Feral Dec. at ¶ 19; *see also* Rodrigues Dec. at ¶ 17. Realistically, even if all of the money from hunting actually goes to conservation efforts, the conservation efforts will be thwarted by the expansion of illegal trade in the black market. Unfortunately, FWS continues to use outdated beliefs about trophy-hunting and conservation—beliefs that do little to reduce poaching and protect the overall viability of certain species, including the black rhino. *See* Feral Dec. at ¶¶ 15–25; *see also* Rodrigues Dec. at ¶ 12–22.

### C. Defendants' issuance of permits authorizing the import of black rhino-hunting trophies.

The story of Defendants' issuances of the Knowlton and Luzich permits at issue here begins with a previously-issued import permit for a black rhino hunting trophy from Namibia.

On September 30, 2009, David Reinke submitted an application to FWS requesting authorization to import a trophy of a black rhino that he intended to kill in Namibia in October 2009. *See* Knowlton Permit Application, Dkt. 4–3, at 22. On April 4, 2013, FWS issued Reinke's permit to import the black rhino trophy into the United States. *See* 78 Fed. Reg. 27,255 (May 9, 2013) (notice that Reinke's permit was issued on April 4, 2013). This was the first time FWS had issued such an import permit. *See* Knowlton Permit Application, Dkt. 4–3, at 9.[4]

One month after Defendants permitted Reinke to import his black rhino trophy into the United States, Luzich purchased a permit to hunt a black rhino in Namibia. *See* Declaration of Michael Harris in Support of Plaintiffs' Consolidated Response in Opposition to Defendants' and Intervenors' Motions to Dismiss, Ex. A at ¶ 4 (June 20, 2013 invoice to Luzich for black rhino hunting permit). Luzich killed his black rhino in September 2013. *See* Complaint at ¶ 64.[5]

In January 2014, Knowlton purchased a Namibia black rhino hunting permit at an auction hosted by the Dallas Safari Club. *See* Declaration of Corey Knowlton, Dkt. 4–10 ("Knowlton Dec."), at ¶ 3. Knowlton's purchase of the hunting permit was conditioned on FWS's issuance of an import permit for his black rhino trophy. *See* Declaration of John J. Jackson, III, Dkt. 4–2 ("Jackson Dec."), at ¶ 6. Knowlton's permit application was submitted to Defendants on or around April 9, 2014. *See* Complaint at ¶ 64. On or around the next day, Luzich submitted an application to import the trophy of the black rhino he killed in 2013. *See id.* On May 18, 2015, Defendants published notice in the Federal Register that they had approved Luzich's and Knowlton's import permit applications. *See* 80 Fed. Reg. 28,297 (May 18, 2015) (noting

---

[4] *See also* USFWS International Affairs, Black Rhino Import Permit from Namibia Questions and Answers, *available at* http://www.fws.gov/international/permits/black-rhino-import-permit.html#4 (stating that the first of the three import permits Defendants have issued for black rhino hunting trophies was issued in April 2013).

[5] *See also* Luzich Enhancement Finding, Dkt. 17–1, at 1 (stating that Luzich killed his rhino in September 2013); Napha distances itself from rhino cow hunter, The Namibian (Oct. 23, 2014), *available at* http://www.namibian.com.na/indexx.php?archive_id=129586&page_type=archive_story_detail&page=1 (last visited Aug. 31, 2015) (stating that Liautaud killed his rhino on September 28, 2013). Note that Defendants have produced a partial administrative record to Plaintiffs in this case. *See* Harris Dec. at ¶ 3.

approval of Luzich's permit on April 7, 2015 and approval of Knowlton's permit on April 20, 2015). That same day, Knowlton killed a black rhino in Namibia. *See* Complaint at ¶ 73.[6]

These facts strongly suggest that the ability to import a black rhino trophy factored heavily into these hunters' decisions to kill a Namibian black rhino in the first place. Also of note, while it is true that Namibia only authorizes the killing of male rhinos, in practice this restriction has not been easy to enforce. Of the four American hunters who have purchased permits to kill Namibian black rhinos, one of them, Liautaud, reportedly killed a female black rhino. *See* Complaint at ¶ 59; *see also* Declaration of John Grobler in Support of Plaintiffs' Consolidated Response to Defendants' and Intervenors' Motions to Dismiss ("Grobler Dec."), at ¶¶ 24–25. And CNN footage from Knowlton's rhino hunt reveals that of the three rhinos in the vicinity of Knowlton's hunt, only two of them had been certified to be killed by the Namibian government, and Knowlton could not confirm that he had shot an approved rhino until after he killed the rhino. *See* Ed Lavandera, *Texas hunter bags his rhino in controversial hunt in Namibia*, CNN (May 21, 2015, 4:28 PM), http://www.cnn.com/2015/05/19/africa/namibia-rhino-hunt/.

The actual import applications themselves shed light on the relationship between these hunter's applications. As part of their permit applications, Luzich and Knowlton submitted FWS's approval documentation for Reinke's import permit application. *See* Complaint at ¶ 13.[7] Additionally, other documents submitted by Luzich and Knowlton in support of their applications are at least three years old, if not more, and thus do not reflect current, evolving information related to trophy-hunting and conservation; nor do they reflect the actual, current status of black rhinos in Namibia. *See generally,* Knowlton Permit Application, Dkt. 4–3.

---

[6] *See also* Ed Lavandera, *Texas hunter bags his rhino in controversial hunt in Namibia*, CNN (May 21, 2015, 4:28 PM), http://www.cnn.com/2015/05/19/africa/namibia-rhino-hunt/ (stating that Knowlton killed a black rhino on May 18, 2015).
[7] *See also* Knowlton Permit Application, Dkt. 4–3, at 17–31 (attaching FWS's "Record of Advice on Import Permit Application," Enhancement Finding, and Section 7 Biological Evaluation Form for David Reinke's permit).

Indeed, neither the Luzich or Knowlton permit applications mentioned the drastic rise in the poaching of black rhinos in Namibia starting in 2014. Thus, Defendants simply "rubberstamped" Knowlton's and Luzich's applications, basing their decision on the fact that they had previously approved an import permit for a black rhino hunting trophy, and the same information that they had based their earlier decision on.[8] As such, it is foreseeable, and actually expected by Defendants,[9] that now that Defendants have approved three applications for black rhino-hunting trophies from Namibia, more American hunters will seek to kill black rhinos and import their trophies into the United States. It is likely that Defendants will point to their issuance of the Reinke, Luzich, and Knowlton permits to justify their approval of future permits, as they have done so in the past. Thus, while the permits that Defendants issued to Luzich and Knowlton to import black rhino-hunting trophies are central to this litigation, this case is about more than these two permits and the two endangered black rhinos these men killed. Defendants have adopted a policy of issuing such permits to American hunters despite the fact that the permitted activity (the import of the trophies) fails to meet the requirements for an ESA Section 10 exemption. This practice of issuing import permits for black rhino-hunting trophies contradicts the text of the ESA, case law interpreting the statute, and Congress's intent when it adopted the statute.

## III.   Legal background and standards.

To satisfy the requirements of Article III standing, a plaintiff must demonstrate injury-in-

---

[8] Another example of Defendants' "rubberstamping" of the permit applications is that Defendants' Enhancement Finding for Knowlton's permit was essentially a cut-and-paste job from Defendants' finding for Luzich's permit. The text of both Enhancement Findings is almost identical, *compare* Luzich Enhancement finding, Dkt. 17–1, to Knowlton Enhancement finding, Dkt. 17–2, despite the fact that Knowlton did not kill his black rhino until May 2015, almost two years after Luzich, when the status of the black rhino in Namibia was substantially different. As discussed earlier, the prevalence of black rhino poaching in Namibia rose dramatically between November 2013 (when Luzich killed his rhino) and May 2015 (when Knowlton killed his rhino).
[9] *See* USFWS International Affairs, Black Rhino Import Permit from Namibia Questions & Answers, *available at* http://www.fws.gov/international/permits/black-rhino-import-permit.html#12 (stating that FWS "anticipate[s] receiving additional applications now that we have issued permits").

fact, causation, and redressability. *Lujan v. Defenders of Wildlife* ("*Defenders*"), 504 U.S. 555, 560–61 (1992). A plaintiff's injury must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations omitted). The injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* And it must be "likely, as opposed to merely speculative," that a favorable decision by the court would redress the plaintiff's injuries. *Id.* at 561 (internal quotations omitted).

The party invoking federal jurisdiction bears the burden of establishing standing. *Id.* A plaintiff must support each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Accordingly, the procedural posture of this case— Defendants and Intervenors seeking dismissal on the pleadings—frames the inquiry as to the adequacy of Plaintiffs' allegations of standing. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) (distinguishing *Defenders* because "since it involved the establishment of injury in fact at the *summary judgment stage*, [it] required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful").[10]

At the motion to dismiss stage, "the trial court[] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Notably, courts generally disfavor motions to dismiss for failure to state a claim. *See, e.g.*, *Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985) ("A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted."). Moreover, in ruling on a motion to dismiss,

---

[10] At the summary judgment stage, plaintiffs "must set forth by affidavit or other evidence specific facts … which for purposes of the summary judgment motion will be taken to be true." *Defenders*, 504 U.S. at 561 (internal quotations omitted) (citing Fed. R. Civ. P. 56(e)). Then, at the trial stage, "those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Id.* (internal quotations omitted).

a court must draw all reasonable inferences in favor of the nonmoving party. *See Barr v. Clinton,* 370 F.3d 1196, 1198 (D.C. Cir. 2004) (internal quotations omitted) ("Because the district court dismissed the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), we construe the complaint liberally, granting plaintiff benefit of all inferences that can be derived from the facts alleged."). General factual allegations of standing are sufficient to defeat a motion to dismiss because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see also Bennett v. Spear*, 520 U.S. 154, 171 (1997) (calling burden of allegation at the pleading stage "relatively modest"). Dismissal for want of subject-matter jurisdiction should occur only if "'it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)) (emphasis added).

When a plaintiff is not the object of the government action challenged, standing is not precluded, but it is ordinarily substantially more difficult to establish. *C-SPAN v. F.C.C.*, 545 F.3d 1051, 1054 (D.C. Cir. 2008). However, a plaintiff can demonstrate standing by showing that the choices made by the regulated third parties "have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.*; *see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 951 (D.C. Cir. 2004) (also noting that the leading cases in the D.C. Circuit "finding standing on the basis of third parties' response to alleged excessive agency stringency. . . involved motions for summary judgment"); *see also Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994) (noting that "'mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice'") (quoting *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C.Cir.1988)).

Furthermore, traceability and redressability are typically "two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012*,* 1017 (D.C. Cir. 1997). As the Supreme Court

commented in *Allen v. Wright,* "[t]o the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." 468 U.S. 737, 753 n.19 (1984)*; see also Natural Res. Def. Council v. EPA*, 542 F.3d 1235, 1245 (9th Cir. 2008) (noting that the "fairly traceable" and "redressability" factors of standing "both [] address 'causation,' [and] are "closely related"); *State of N.Y. v. Thomas,* 613 F.Supp. 1472, 1481 (D.D.C. 1985), *rev'd on other grounds, Thomas v. State of N.Y.,* 802 F.2d 1443 (D.C. Cir. 1986) (stating that causation and redressability are "inseparable" when plaintiffs seek "an order compelling the [federal agency] to end the very inaction which is the cause of plaintiff's injuries").[11]

## IV.   Plaintiffs' allegations are sufficient to establish standing at the motion to dismiss stage.

Plaintiffs have associational standing to bring this lawsuit. Associational, or representational, standing exists if an organization can show that (1) at least one member would have standing individually, (2) the interests sought to be protected are germane to the purposes of the organization, and (3) the case does not require the participation of individual members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977). Plaintiffs plainly satisfy the second and third factors here; the interests Plaintiffs seek to protect through this litigation— protecting endangered black rhinos—are germane to the purposes of both organizations, which

---

[11] Intervenors cite to *GSS Group Ltd. v. Nat'l Port Authority* to argue that ZCTF has no constitutional rights and cannot sue in U.S. courts. *See* Int. Br. at 14, citing 680 F.3d 805 (D.C. Cir. 2012). But *GSS Group* involved whether the court had personal jurisdiction over the foreign defendant, and had nothing to do with standing. Here, this Court has personal jurisdiction over ZCTF because ZCTF has consented to personal jurisdiction by filing this lawsuit. *See, e.g.*, *Adam v. Saenger,* 303 U.S. 59, 67–68, (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence."); *Estrada v. Ahrens,* 296 F.2d 690, 694 (5th Cir.1961) (noting that alien's act of bringing suit automatically establishes consent to personal jurisdiction); *Safari Club Int'l v. Jewell,* No. 14–0670-RCL, Order, Dkt. 62 (Mar. 12, 2015) (finding ZCTF had standing to intervene).

are dedicated to protecting animals, including endangered species, and this case does not require the participation of individual members. *See* Feral Dec. ¶¶ 3, 4, 7, 8–25; Rodrigues Dec. at ¶¶ 2–3; *see also Safari Club Int'l v. Jewell*, No. 14–0670-RCL, Order, Dkt. 62, at 7 n.2 (Mar. 12, 2015) (finding that FoA and ZCTF had standing to intervene because they had a member with individual standing and there was no dispute that they satisfied the second and third prongs of the test). Thus, this Court should find that Plaintiffs satisfy the second and third factors, and Plaintiffs' brief will only address whether Plaintiffs have at least one member with standing.[12]

### A. Plaintiffs have sufficiently alleged injury-in-fact.

The law is unquestionably clear that a plaintiff's member's desire to observe animals is "undeniably a cognizable interest for purposes of standing." *Defenders*, 504 U.S. at 562–63; *see also Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (internal quotations omitted) (noting that "harm to mere esthetic interests of the plaintiff … will suffice to establish a concrete and particularized injury"); *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) (finding that a court can find injury-in-fact "when a defendant adversely affects a plaintiff's enjoyment of flora or fauna"). Indeed, just this year, in *Safari Club Int'l v. Jewell,* a case involving nearly all the same parties as before this Court here, a court in this district found that FoA and ZCTF sufficiently alleged injury-in-fact because an import ban on elephant hunting trophies from Zimbabwe:

> affect[ed] not only elephants taken in the past but also those that may be taken in the future, with the upshot being that this litigation may injure or impair [FoA and ZCTF's] interest in viewing elephants in the future. Accordingly, [FoA and ZCTF] have an adequate interest in the litigation that may be impaired by its outcome.

No. 1:14-cv-00670-RCL, slip. op. at 6 (D.C.C. Mar, 12, 2015). Specifically, the *Safari Club* court found that Johnny Rodrigues, the founder of ZCTF and a member of FoA, sufficiently

---

[12] Plaintiffs are not relying on organizational or informational injury to establish standing. Thus, they do not respond to Defendants' and Intervenors' arguments on these points.

demonstrated injury because he lived in the area in question, worked in proximity to the elephants at issue in the case, viewed the elephants for personal enjoyment, and feared that his ability to view elephants in the future would be compromised if the hunting of elephants continued. *Id.* at 6–7.

Applying this reasoning, this Court should find that Plaintiffs here have sufficiently alleged a legally cognizable injury-in-fact. For example, Plaintiffs' Complaint alleges:

> FoA has members who travel to, and reside and work in Namibia, and who derive ongoing and lasting recreational, aesthetic, moral, and spiritual benefits from observing black rhinos in their native habitat in Namibia, and knowing that black rhinos live in the wild in Namibia.

Complaint at ¶ 10. Plaintiffs also allege that their members' interests are adversely affected when people kill rhinos. *Id.* at ¶¶ 12–13. These allegations suffice to show that the injury is "actual or imminent" and "concrete and particularized," both because black rhinos have already been killed by trophy-hunters and because they likely will continue to be killed by trophy-hunters in the future. This is all Plaintiffs need to allege at the motion to dismiss stage to demonstrate injury-in-fact. *Defenders*, 504 U.S. at 561.

Although the allegations in the Complaint are more than sufficient to defeat a motion to dismiss, Plaintiff FoA provides a sworn declaration from John Grobler, a member whose interests have been and will continue to be affected by Defendants' issuance of permits to import black rhino-hunting trophies from Namibia into the United States.[13] In his declaration, Grobler describes his first encounter with a black rhino in the wild. *See* Grobler Dec. at ¶ 6. He discusses his ongoing work in reporting on the poaching of black rhinos in Namibia, and his regular travels

---

[13] Plaintiffs incorporate the statements made in the Declaration of John Grobler into this brief. Plaintiffs focus in this brief on FoA's standing because if one plaintiff has standing there is "Art. III jurisdiction to entertain those common issues presented by all plaintiffs[.]" *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 402 n. 22 (1982) (citations omitted). Here, all four claims are common to both plaintiff organizations. Thus, if this Court finds that FoA has sufficiently alleged standing, it need not address whether ZCTF also has standing. *See Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160 (1981) ("Because we find that [one plaintiff] has standing, we do not consider the standing of the other plaintiffs").

to parts of the country where black rhinos live in the wild as part of this work. *Id.* at ¶¶ 5, 8–15. He feels a moral responsibility towards protecting black rhinos, takes pleasure from observing them in the wild, hopes to continue to do so, and would like to show them to his daughter. *Id.* at ¶¶ 15–16, 26, 28. Based on all of these interests, Grobler is reasonably concerned that Defendants' decisions to allow hunters to import black rhino trophies into the United States negatively affect his interests in observing, preserving, and protecting black rhinos, because it has led and will continue to lead to death of black rhinos. *Id.* at ¶¶ 17, 19, 21, 26, 30.

Grobler's declaration defeats Defendants' arguments that Plaintiffs lack representational injury because they "fail to identify an individual member of either organization with concrete plans to view rhinos in Namibia, much less in the specific areas where the rhinos at issue in this case were hunted." *See* Def. Br. at 11; *see also* Int. Br. at 13–14. Defendants point to *Defenders,* where the Supreme Court found that two Americans who had previously visited other countries where the federal government was planning projects that would harm particular species did not have standing based on their interests in protecting those species merely because they "some day" intended to return to these places. *See Defenders,* 504 U.S. at 564. Intervenors similarly cite to prior cases brought by FoA to argue that Plaintiffs cannot show injury in this case because they have not alleged a sufficient geographic nexus to Namibia. *See* Int. Br. at 12–14. But in those cases the courts found that FoA's declarations failed to demonstrate injury because "no individual members [we]re named, and no concrete plans to return to the geographical area identified," *Friends of Animals v. Jewell*, No. 13-cv-02034, 2014 WL 3837233, at *4 (E.D. Cal. Aug. 1, 2014), and because the declarant did not view the species at issue until after the complaint had been filed and did not intend to return to view the species. *See Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 110 (D.D.C. June 22, 2009). Contrary to these cases, Grobler does not live "anywhere in the world"—he lives in Namibia, where the endangered black rhinos live and are being killed by trophy hunters; he regularly visits the areas where black rhinos live and has plans to continue doing so; and he has observed black rhinos in the wild before in

Namibia and hopes to able to continue to do so. *See* Grobler Dec. at ¶¶ 2, 6– 16. Thus, Grobler's

declaration renders Defendants' and Intervenors' arguments obsolete. *See Safari Club Int'l,* No.

1:14-cv-00670-RCL, at 6 (finding that FoA and ZCTF had standing to intervene because

"Rodrigues lives in Zimbabwe so he does not need particularized plans *to go to* Zimbabwe to

view elephants – he is already there.").

Many other courts have found injury based on allegations that, due to government action

(or inaction) that led to third-party hunting, a plaintiff's members were less likely to observe

species in the wild. *See, e.g.*, *Fund for Animals v. Lujan,* 962 F.2d 1391, 1396 (9th Cir. 1992)

(finding injury where plaintiff's members had fewer opportunities to view species in the wild due

to hunting); *Humane Soc'y of the U.S. v. Hodel,* 840 F.2d 45, 52 (D.C. Cir. 1988) (referring to an

injury based on "depleting the supply of animals and birds that refuge visitors seek to view" as a

"classic aesthetic interest[]" that has "always enjoyed protection under standing analysis"); *Cary*

*v. Hall*, No. C 05-4363 VRW, 2006 WL 6198320, at *2 (N.D. Cal. Sept. 30, 2006) (finding

injury where plaintiffs' member alleged that FWS's decision to allow trophy-hunting of captive-

bred endangered antelope "will adversely affect wild populations of the three antelope species in

North Africa where [plaintiffs' member] works with and observes them. Nothing more is

required."). Here, the very rhinos that Grobler has an interest in have been and are likely to

continue to be killed by trophy-hunters. The fact that Intervenors place no value on the black

rhinos marked for killing by hunters, *see* Int. Br. at 13, does not render Plaintiffs' members

interests in these rhinos meaningless. As Justice Scalia explained in *Defenders:*

> It is clear that the person who observes or works with a particular animal
> threatened by a federal decision is facing perceptible harm, since the very subject
> of his interest will no longer exist. It is even plausible—though it goes to the
> outermost limit of plausibility—to think that a person who observes or works with
> animals of a particular species in the very area of the world where that species is
> threatened by a federal decision is facing harm, since some animals that might
> have been the subject of his interest will no longer exist.

504 U.S. at 566–67. Plaintiffs, at a minimum, fall within Justice Scalia's category of persons

who are harmed when animals of a particular species that they observe and work with are affected by a federal decision. Thus, based on these well-accepted principles, this Court should find that Plaintiffs have sufficiently alleged injury-in-fact.

**B.      Plaintiffs have sufficiently alleged causation.**

Plaintiffs' injuries—brought on by the killing of black rhinos—are directly caused by Defendants' decision to issue permits for hunters to import black rhino trophies into the United States. Defendants and Intervenors claim that Plaintiffs cannot establish causation because the Namibian Ministry of Environment and Tourism ("MET"), not Defendants, makes the decision that causes Plaintiffs' injuries: authorization for hunters to kill black rhinos in Namibia. *See* Def. Br. at 16–17; Int. Br. at 25. Defendants "merely allow[]" individuals to import trophies into the United States. Def. Br. at 16–17. But this argument misses the point. While MET's decisions to issue permits to kill black rhinos could cause injury to Plaintiffs, it will do so only if hunters are willing to go there and pay to hunt rhinos. As noted above, the majority of those seeking to hunt rhinos are Americans and are not willing to pay for the hunt if they cannot receive a permit to import the trophy back to the United States. This lawsuit is targeted towards Defendants' issuance of import permits for hunting trophies of black rhinos. *See e.g.,* Complaint at ¶¶ 12–13.

Defendants cite to this Court's decision in *Safari Club v. Jewell* to support their argument that Plaintiffs lack causation because trophy-hunting of black rhinos will continue regardless of whether Defendants allow the import of black rhino-hunting trophies. *See* Def. Br. at 17. In *Safari Club v. Jewell,* a hunting group sought a preliminary injunction to prevent a decision from FWS suspending the import of elephant hunting trophies from two African countries from taking effect. 47 F. Supp. 3d 29, 31 (D.D.C. 2014) (A. B. Jackson, J.). The hunting group argued that FWS's decision irreparably harmed its members' recreational, conservation, and economic interests. *Id.* at 32–37. This Court found that the group's interests were not "irreparably harmed" and denied the motion for a preliminary injunction because the suspension did not prohibit U.S. hunters from hunting elephants; as such, any harm to the hunters' interests was self-inflicted

because in order to be harmed the hunters would have to decide, for themselves, that they did not wish to hunt elephants anymore in light of the import suspension. *Id.* at 35–37.[14] Notably, in *Safari Club*, this Court stated that it was not deciding whether the hunting group could establish standing. *Id.* at 35. Thus, this Court's decision in *Safari Club* is not dispositive of the question of whether Plaintiffs have adequately alleged standing here.

Significantly, after this Court's decision denying the preliminary injunction in *Safari Club* (and after the case was transferred to a different judge), FoA and ZCTF sought to intervene to help defend FWS's suspension on the import of elephant hunting trophies. *See Safari Club Int'l*, No. 1:14-cv-00670-RCL, at 1. The new court granted FoA's and ZCTF's motion to intervene, stating that "[a]lthough hunting elephants is still allowed in Zimbabwe, the FWS decision has resulted in U.S. hunters cancelling elephant hunts." *Id.* at 9. In reaching this decision, the court cited statements in Safari Club's complaint and declarations submitted by hunters stating that American hunters had less interest in hunting and were cancelling hunts because of the import suspensions. *Id.* Based on these statements and testimony, the court concluded that U.S. hunters' decisions to forgo elephant trophy hunts was fairly traceable to FWS's decision to ban import of elephant hunting trophies, and thus that "a decision favorable to [FoA and ZCTF] that keeps FWS's determination in place will affect their interest in viewing and protecting elephants." *Id.* As such, the court found that FoA and ZCTF had standing to intervene.

Similarly, here, while Namibia can continue to permit the killing of black rhinos

---

[14] Intervenors cite to *Grocery Manufacturers Association v. EPA* to support their related argument that Plaintiffs cannot establish standing because Defendants' actions here do not force hunters to kill rhinos. *See* Int. Br. at 27–28. Intervenors' reliance on *Grocery Manufacturers* in this case is inapposite because, unlike the petroleum association in that case, here Plaintiffs have no control over the source of their injury; they exert no influence over whether a trophy hunter applies for or uses an import permit; in no way can Plaintiffs' injury be properly interpreted as "self-inflicted." *Cf. Grocery Mfr. Ass'n v. EPA*, 693 F.3d 169, 117–18 (D.C. Cir. 2012) ("To the extent the petroleum group's members implement that option voluntarily, any injury they incur as a result is a 'self-inflicted harm' not fairly traceable to the challenged government conduct.").

regardless of whether Defendants allow hunters to import trophies, declarations submitted by Intervenors demonstrate that if Defendants prohibited the import of black rhino-hunting trophies into the United States, hunters will no longer be interested in killing rhinos. *See, e.g.*, Declaration of Robert Preston Kern, Dkt. 18–9, at ¶ 10 ("In my professional opinion, I believe the ability to import a black rhino in Namibia is a deciding factor in whether U.S. hunters will be involved in this program…. [I]f import permits are uncertain or unlikely to be granted, U.S. hunters are less likely to participate in hunts in this market."); Declaration of Ben Carter, Dkt. 4–11 ("Carter Dec."), at ¶ 18 ("I believe [Dallas Safari Club]'s members will be less likely to bid for black rhino hunts if they cannot obtain import permits."). Knowlton himself submitted a declaration stating that: "I would not have purchased the hunt without the promise of an import permit." Knowlton Dec. at ¶ 15. Thus, applying the same reasoning as the court did in *Safari Club,* trophy hunters' decisions to hunt black rhinos are fairly traceable to Defendants' decision to allow hunters to import the trophies into the United States. It is much more than speculative here that, if Defendants stopped allowing such imports, fewer Americans would want to hunt black rhinos. For example, if Defendants had not issued Knowlton an import permit for his black rhino hunting trophy, Knowlton likely would not have killed his black rhino, and there would be one additional rhino that Plaintiffs' members, including John Grobler, could observe in the wild, and they likewise would not have suffered the emotional distress of seeing the CNN video of Knowlton killing his black rhino. *See* Grobler Dec. at ¶ 27.

Moreover, this Court has already found a causal nexus between Defendants' decisions to issue import permits and American hunting in Namibia sufficient for standing purposes in this case. In granting MET's motion to intervene, this Court found that MET had standing based on allegations that the relief Plaintiffs' seek "would discourage hunting and thereby reduce the funding the Ministry directs towards its rhino conservation programs." Memorandum Opinion and Order, Dkt. 15, at 4 (granting intervention of the Ministry of Environment and Tourism of the Republic of Namibia). Applying this same reasoning, this Court should find that Plaintiffs'

injury is fairly traceable to Defendants. MET alleges that its economic interests will be injured

because, if Defendants prohibit the import of black rhino-hunting trophies, fewer Americans

would want to kill black rhinos and MET would thus receive less revenue for the hunting

permits. *See e.g.,* Declaration of Republic of Namibia, Ministry of Environment and Tourism,

Dkt. 13–2, at ¶ 5. Likewise, Plaintiffs allege that their members' aesthetic and other interests

have been and will continue to be injured because, if Defendants allow the import of black rhino-

hunting trophies, Americans will want to kill black rhinos. Plaintiffs' argument is the mirror

image of MET's argument, and for purposes of standing, there is no distinction between the

injured interests: the law treats aesthetic interests and economic interests the same. *See, e.g.*,

*Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like

economic well-being, are important ingredients of the quality of life in our society, and the fact

that particular environmental interests are shared by the many rather than the few does not make

them less deserving of legal protection through the judicial process.").

Furthermore, in finding that MET had standing to intervene, this Court did not require

MET to provide documentation showing that it would in fact receive less money due to lack of

interest from American hunters, or that demand for hunting permits would not be as high. It was

enough that MET submitted declarations from officials swearing this to be true. *See*

Memorandum Opinion and Order, Dkt. 15, at 5 ("Since the threatened loss of hunters' fees and

consequent reduction of funds for Namibia's conservation program constitute an injury fairly

traceable to the relief that plaintiffs seek, and a decision favorable to the movant would redress

that injury, the Court finds that the Ministry has standing."). Similarly, here, this Court should

not require Plaintiffs to prove that, in fact, less rhinos will die if Defendants stop issuing permits

to import black rhino-hunting trophies; that is a question for the merits. As the *Safari Club Int'l*

court reasoned:

> Whether the cancellation of elephant hunts *helps* African elephants, as movants
> contend, or *harms* them, as plaintiffs contend, is a merits question that will be
> addressed at the summary judgment stage of this case. At this juncture of the
> proceedings, it is enough that movants are "so situated" that disposing of the case

> may impair or impede their ability to protect their interests and it is likely that
> the Court can redress movants' injury.

*See* Dkt. 62, No. 1:14-cv-00670-RCL, at 9. Similarly, weighing all reasonable inferences in favor

of Plaintiffs, this Court must find—and applying the same reasoning and standards that it did to

MET's motion to intervene—that Plaintiffs have adequately alleged causation.

Intervenors cite to the district court's decision in *Fund for Animals v. Norton*, a case

involving a challenge to FWS's decision to grant import permits for argali sheep hunting trophies

to argue that Plaintiffs cannot establish causation. 295 F. Supp. 2d 1, 7 (D.D.C. July 31, 2003).

The *Fund for Animals* district court found that the plaintiffs lacked standing because "even if the

Service allowed no import permits, the three governments would remain as free as they now are

to permit the sport hunting of argali in their own countries." *Id.* at 7. However, the D.C. Circuit

opinion in that case reversed the district court to find that the Mongolian government had

standing to intervene because if FWS were to prohibit the import of argali sheep hunting

trophies, less American hunters would travel to Mongolia to kill argali sheep and Mongolia

would receive less revenue to support its argali sheep conservation program. *Fund for Animals v.

Norton*, 322 F.3d 728, 733–34 (D.C. Cir. 2003). Notably, the D.C. Circuit reached this decision

despite the fact that Mongolia would still be able to sell hunting licenses to American and non-

American hunters, and thus still be able to generate revenue for its argali conservation program.

As the new *Safari Club* court recently found, the D.C. Circuit's decision finding that Mongolia

had standing in *Fund for Animals* is more persuasive than the district court's decision finding

that plaintiffs' did not have standing. *See* Dkt. 62, No. 1:14-cv-00670-RCL, at 8–9.[15]

Furthermore, Plaintiffs acknowledge that establishing causation is more difficult when

their injury stems from the government's regulation of third parties, and not of plaintiffs

themselves. But there are two categories of cases in which courts have found that plaintiffs can

establish causation and redressability in cases challenging government action on the basis of

---

[15] Moreover, the district court in *Fund for Animals* was evaluating whether plaintiffs could
establish standing at the summary judgment stage, 295 F. Supp. 2d at 3, and thus the plaintiffs'
burden was higher than the Plaintiffs' present burden in this case.

third-party conduct, and Plaintiffs' case easily fits within both of these categories. The first category involves cases in which plaintiffs "challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940. The D.C. Circuit and district courts within the circuit have found causation based on this theory in cases factually similar to the case here. For example, in *Animal Legal Defense Fund, Inc. v. Glickman,* plaintiffs challenged government regulations on the grounds that they did not comply with the Animal Welfare Act and allowed third parties to keep primates under inhumane conditions. 154 F.3d 426, 428 (D.C. Cir. 1998). The D.C. Circuit found that plaintiffs had standing to sue, despite the fact that third parties were responsible for the inhumane conditions that caused plaintiffs' member injury, because if the government had passed regulations complying with the Animal Welfare Act, then the inhumane conditions would have been prohibited by those compliant regulations. *Id.* at 443. While discussing *Animal Legal Defense Fund*, the court in *National Wrestling Coaches Association* explained "[c]ausation and redressability thus are satisfied in this category of cases, because the intervening choices of third parties are not truly independent of government policy." 366 F.3d at 940–41; *see also, e.g.*, *Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 92 (D.D.C. April 23, 2009) (finding that plaintiffs challenging Postal Service's mailing of a pro-animal fighting magazine under the Animal Welfare Act "arguably" satisfied causation because they challenged "government action that authorizes what [plaintiff] alleges is the illegal acceptance of mail matter.").

Here, similarly, Plaintiffs challenge a government action that permits third parties to do something that would otherwise be illegal: if Defendants did not issue import permits to trophy hunters, those hunters would not be able to import black rhino-hunting trophies because the ESA prohibits such imports except as permitted by Defendants. Thus, the third-party hunters' choices are not "truly independent of government policy" because they cannot import the trophies absent Defendants' permission. Moreover, while Defendants and Intervenors would have this Court

believe that a big-game hunter would spend tens of thousands, and in the case of Knowlton and Luzich hundreds of thousands of dollars, to travel to Africa to kill an endangered black rhino regardless of whether that hunter could bring back a trophy, that is simply not the case. As discussed elsewhere, Intervenors have submitted declarations both in this case and other factually-analogous cases directly linking Defendants' decisions regarding whether to allow hunters to import trophies of black rhinos and other endangered and threatened species, with the hunter's decision as to whether to go on the hunt to begin with. *See*, *e.g.*, Carter Dec. at ¶¶ 17–18 (stating that if Safari Club members cannot bring back trophies for a particular species, they will be less likely to bid on hunting permits, *i.e.*, *less likely to hunt*, for that species). Simply put, if hunters cannot bring back a trophy, they do not want to go on the hunt. *Id.* Plaintiffs made specific allegations in their Complaint and have provided declarations to the same effect. *See*, *e.g.*, Complaint at ¶ 18 ("On [*sic*] order preventing the importation of endangered animal parts will discourage U.S. trophy hunters from killing endangered animals abroad and bringing them home to display as trophies."); *see also* Grobler Dec. at ¶ 30 (noting his belief that if FWS stopped issuing permits to "hunters to import sport-hunted trophies of black rhinos, then I believe that less rhinos will be put at risk and die and my interests in seeing this great, iconic species protected for myself and future generations in the wild will be preserved").

For similar reasons, Plaintiffs' case also falls within the second category, which involves cases where plaintiffs can show "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940–41. While Defendants point to the fact that Luzich hunted his rhino before he even applied for an import permit as evidence that American hunters will continue to hunt black rhinos even without the opportunity to import the trophies, Def. Br.at 17, Defendants fail to point out that Luzich purchased his hunt just one month after Defendants issued the first-ever import permit for a black rhino hunting trophy. *See* Harris Dec., at 5–8, 21–25. In other words, at the time he decided to spend a

significant amount of money on the hunt Luzich had at least some assurance that he would be able to obtain an import permit to bring his trophy home. Similarly, Knowlton's own declaration states that he "would not have purchased the hunt without the promise of an import permit." Knowlton Dec. at ¶ 15. In fact, one of the conditions of Knowlton's purchase of his hunting permit was that Defendants would issue him an import permit. *See* Jackson Dec. at ¶ 21 ("The final condition [of Knowlton's purchase of the hunting permit] was that the bid would only be transferred to [Namibia] if FWS issued an import permit for the black rhino trophy.").

To conclude, if Defendants had not issued Knowlton an import permit, Knowlton's purchase of the black rhino hunting permit would have been cancelled, and one more black rhino would likely still be alive. Likewise, Luzich's decision to hunt a black rhino in Namibia was likely influenced by Defendants' decision to issue an import permit to Reinke. *See* Complaint at ¶ 5. More broadly, statements in numerous declarations from this case and others establish that hunters are less likely to purchase permits to hunt a particular species if they cannot bring a trophy back. *See, e.g.*, Knowlton Dec. at ¶ 15. As such, it is not speculative that Plaintiffs' injuries from the death of black rhinos are fairly traceable to Defendants' decisions to issue import permits for black rhino-hunting trophies. *See Salmon Spawning and Recovery Alliance v. U.S. Customs and Border Prot.*, 550 F.3d 1121, 1125 (Fed. Cir. 2008) (finding injury-in-fact fairly traceable to defendants where plaintiffs alleged that they had members who were "being adversely affected and irreparably injured by defendants' failure to prevent the importation of endangered salmon because this failure has jeopardized the continued existence of salmon"). Thus, Plaintiffs have adequately alleged that their injuries are fairly traceable to Defendants' actions.

**C.     Plaintiffs have sufficiently alleged redressability.**

Plaintiffs' allegations also sufficiently establish that this Court can redress Plaintiffs' injuries. In cases where a court finds that plaintiffs have established causation, it almost always follows that plaintiffs' injuries are redressable by a court order. *See Cmty. for Creative Non-*

*Violence v. Pierce*, 814 F.2d 663, 670 (D.C. Cir. 1987) ("It is difficult to imagine a scenario in which a plaintiff who has failed to establish the requisite causation could nonetheless demonstrate sufficient redressability."). Here, Plaintiffs' members are injured when trophy hunters kill black rhinos, and these injuries are fairly traceable to Defendants' decision to issue permits to hunters to import black rhino trophies. Thus, an order from this Court enjoining Defendants from issuing import permits for black rhino-hunting trophies will redress Plaintiffs' injuries because, as Plaintiffs allege, fewer black rhinos will die.

Defendants again point to the district court's decision in *Fund for Animals* to argue that Plaintiffs cannot establish redressability. Def. Br. at 17. In *Fund for Animals*, the district court found that plaintiffs could not establish redressability because prohibiting the import of trophy-hunted argali sheep and listing those sheep as endangered on the ESA "would not prohibit those [foreign] governments from issuing hunting permits, and because prior U.S. import restrictions did not decrease the hunting and poaching of argali." 295 F. Supp. 2d at 8. But, as discussed above, the D.C. Circuit's finding that the intervenors in *Fund for Animals* had standing is more instructive—and more persuasive—than the district court's decision in that case finding that the plaintiffs lacked standing. *See Safari Club Int'l,* No. 1:14-cv-00670-RCL, at 8–9 (discussing *Fund for Animals*, 322 F.3d 728 (D.C. Cir. 2003)). And in finding intervenors' injuries redressable, the D.C. Circuit did not consider the fact that the foreign governments could continue to generate some money by selling hunting permits; instead, the D.C. Circuit found it sufficient that a court order favorable to the foreign governments—*i.e.*, an order allowing American hunters to import argali sheep trophies—would redress the foreign governments' alleged injuries of reduced income from trophy hunters. *Id.*

Likewise, the fact that hunters from other countries might take the place of American hunters does not mean that Plaintiffs' injuries are not redressable because a plaintiff "need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 244 n.15. Thus, in *Massachusetts v. EPA,* the Supreme Court found that plaintiffs had standing to

challenge EPA's denial of a petition to regulate greenhouse gas emissions from motor vehicles under the Clean Air Act even though, as the Court noted, a favorable decision would not wholly prevent plaintiffs' injury: it was enough that the "risk would be reduced to some extent if petitioners received the relief they seek." *See* 549 U.S. 497, 525–26 (2007). Likewise, Plaintiffs are not required to show that an order from this Court would stop all hunting of black rhinos in Namibia, or even significantly reduce the risk that black rhinos might go extinct. Instead, Plaintiffs only need to show that the risk of rhinos dying will be "reduced to some extent" if this Court ordered Defendants to stop permitting the import of black rhino-hunting trophies of endangered species into the United States.[16] Thus, the fact that an order from this court would not completely prevent the killing of black rhinos by trophy hunters does not mean that Plaintiffs' injuries are not redressable.[17]

Intervenors cite two cases from the District of Oregon involving Wildlife Services, a department within the U.S. Department of Agriculture charged with carrying out that agency's wildlife control programs, to support their argument that Plaintiffs cannot establish causation or redressability because their injuries are caused by third-party hunters over whom the federal

---

[16] As FWS Director and Defendant Dan Ashe acknowledged in October 2014, U.S. citizens make up "a disproportionately large share of foreign hunters who book trophy hunts in Africa." *See* Complaint at ¶ 13; *see also* Feral Dec. at ¶ 8, Ann M. Simmonds and Christina Littlefield, C*ecil the lion's killer is not alone: Trophy hunters disproportionately Americans*, L.A. Times, July 28, 2015, http://www.latimes.com/world/africa/la-fg-lion-killing-20150728-story.html.

[17] In *Defenders of Wildlife v. Gutierrez,* plaintiffs challenged federal agencies' denial of a petition for an emergency rulemaking asking the Coast Guard and other agencies to adequately consult on impacts of their regulations governing commercial shipping vessel movement on right whales. 532 F.3d 913 (D.C. Cir. 2008). In challenging plaintiffs' standing, the agencies' argued that the court could not redress plaintiffs' injury (resulting from the death of right whales from collisions with commercial vessels) because the Coast Guard lacked authority to take action to protect right whales from collisions. *Id.* at 925. The court, however, found that an order could redress plaintiffs' injury in part, and thus that plaintiffs had standing. *Id.* Notably, the court reached this conclusion despite the fact that third parties directly caused plaintiffs' injury, because it assumed—as it stated it had to do for purposes of evaluating plaintiffs' standing—that the plaintiffs were correct on the merits, *e.g.,* that the Coast Guard played a bigger role in promulgating the regulations governing commercial shipping vessel movement than the Coast Guard suggested. *See id.* at 924–25.

defendant has no control. *See* Int. Br. at 25, n.25 (discussing *Goat Ranchers of Or. v. Williams*, No. 08–97–ST, 2009 WL 883581 (D. Or. March 30, 2009), *aff'd Goat Rancers of Or. v. Williams,* 379 Fed. Appx. 662 (9th Cir. 2010); *Americanus v. Wildlife Services*, No. CV–03–1606–HU, 2004 WL 2127182 (D. Or. Sept. 23, 2004). In both of these cases, the district courts found that plaintiffs lacked standing at the summary judgment stage because, even if Wildlife Services could no longer participate in the state wildlife control programs, the states would continue the programs and animals would continue to die. *Goat Ranchers of Or.*, 2009 WL 883581, at *3; *see also Americanus*, 2004 WL 2127182, at *5–6. However, a recent Ninth Circuit decision, *WildEarth Guardians v. USDA*, effectively reverses the district courts' reasoning in these cases. The Ninth Circuit held that it could redress plaintiffs' injuries, even though [the State] argued that it would continue to kill animals without Wildlife Services help, because:

> the mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury. So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.

No. 13–16071, 2015 WL 4604142, at *17 (9th Cir. Aug. 3, 2015).[18] Thus, the fact that Americans and citizens from other countries may still purchase hunts to kill black rhinos in Namibia does not defeat redressability because this Court can issue an order preventing at least some hunters from importing rhino trophies and thus redressing Plaintiffs' member's injuries.[19]

---

[18] For similar reasons, the Ninth Circuit's reasoning in *WildEarth Guardians* similarly rebuts Intervenors' reliance on *Fund for Animals v. Babbitt*, 2 F. Supp. 2d 570, 575 (D. Vt. 1997).

[19] Intervenors point out that neither Luzich nor Knowlton has imported their sport trophies. *See* Int. Br. at 28. To the extent Intervenors are suggesting that Plaintiffs have not been injured because the trophies have not yet been imported, Intervenors are wrong. Plaintiffs' injury is based on Defendants' decision to issue of the permits in the first place. Whether the trophy-hunters actually use the permits is not material to whether Plaintiffs have suffered an injury.

**D.      Plaintiffs have standing based on Defendants' violation of Plaintiffs' procedural rights.**

Plaintiffs' Fourth Cause of Action clearly alleges a procedural violation of NEPA causally related to Plaintiffs' substantive injuries. Specifically, Plaintiffs allege that Defendants' decisions "have potential environmental consequences, are highly controversial, and have unknown risks." *See* Complaint at ¶ 107. As such, Defendants' failure to comply with NEPA's procedural requirements implementing regulations—including the preparation of an environmental assessment ("EA") or environmental impact statement ("EIS")—was "arbitrary, capricious, an abuse of discretion and contrary to NEPA and its implementing regulations." *Id.*

Contrary to Intervenors' argument, NEPA applies to Defendants' actions. Intervenors' argument fails for several reasons. First, it attempts to shoehorn a 12(b)(6) motion for a failure to state a claim into a 12(b)(1) motion to dismiss. *See* Int. Br. at 20. But more importantly, while the case law is unclear as to whether NEPA applies to federal actions taken abroad, Plaintiffs here are not challenging a federal action taken abroad—instead, Plaintiffs' NEPA challenge involves whether Defendants followed the decision-making procedures legally required by the statute. As the D.C. Circuit explained in *Environmental Defense Fund, Inc. v. Massey*, "[b]ecause the decisionmaking processes of federal agencies take place almost exclusively in this country and involve the workings of the United States government, they are uniquely domestic." 986 F.2d 528, 532 (D.C. Cir. 1993); *see also Natural Res. Def. Council Inc. v. U.S. Dep't of Navy*, No. CV-01-07781 CAS (RZX), 2002 WL 32095131, at *10 (C.D. Cal. Sept. 17, 2002) (noting the "uniqueness of NEPA, which is a purely procedural statute that … has no substantive effect outside the United States"). Intervenors cite to a district court opinion involving a challenge to FWS's decision to issue permits to import live elephants from Swaziland. *See* Int. Br. at 20 (citing *Born Free USA v. Norton*, 278 F. Supp. 2d. 5 (D.D.C. 2003)). In that case, the plaintiffs argued that defendants' NEPA analysis was insufficient and inadequate. *Born Free USA*, 278 F. Supp. 2d. 5. Putting aside, as Intervenors do, the fact that this decision was vacated, in *Born Free* the court did not find NEPA inapplicable *in toto* to FWS's decision to issue import

PLAINTIFFS' CONSOLIDATED OPPOSITION                                        28

permits for the live rhinos. Rather, FWS argued, and the district court agreed, that while NEPA did not require FWS to analyze the effects in Swaziland of removing the elephants, FWS did have to do NEPA analysis on the domestic effects of issuing the import permits. *Id.* at 20.

Recognizing that NEPA applies, Defendants did a NEPA analysis, and found that their decision qualified for a categorical exemption under the statute—not that NEPA did not apply at all. *Id.* at 22. Intervenors' arguments concerning the "geographic scope" of the import permits are likewise unavailing, *see* Int. Br. at 20; Plaintiffs have alleged a sufficient geographic nexus to Namibia, *see* Complaint at ¶ 10, and Plaintiffs have provided a declaration from an injured member who lives in Namibia and visits the area in question. *See generally,* Declaration of John Grobler.

Intervenors also argue that Plaintiffs cannot establish standing based on a procedural violation because no EIS or EA was needed here. *See* Int. Br. at 19. But this is a merits argument and, on a motion to dismiss based on standing, this Court must assume that Plaintiffs will win on the merits. Plaintiffs have alleged that Defendants failed to follow the required NEPA procedures. *See* Complaint at ¶¶ 106–107. One of NEPA's primary aims is to ensure "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Natural Resource Def. Council*, 462 U.S. 97, 103 (1983). Defendants' violation of NEPA deprived Plaintiffs of the opportunity to assess and address the potential environmental impacts of Defendants' decisions.[20]

A plaintiff has standing to challenge an agency's failure to follow required procedures if the procedures were "designed to protect some threatened concrete interest." *Defenders*, 504

---

[20] NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed action, *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989) and, for "major Federal actions significantly affecting the quality of the human environment," federal agencies must prepare an EIS. 42 U.S.C. § 4332(2)(C). Major federal actions under NEPA include "actions approved by *permit* or other regulatory decision." 40 C.F.R. § 1508.18 (emphasis added). As such, Defendants' approval of permits to import black rhino-hunting trophies is a major federal action under NEPA.

U.S. at 573 n.8. To make this showing, plaintiffs "must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d. 658, 664 (D.C. Cir. 1996). Plaintiffs in this case have readily satisfied this requirement because Defendants' procedural violations are causally related to the concrete, particularized harm suffered by Plaintiffs' members, including John Grobler, whose interests are harmed when black rhinos are killed. *See generally,* Declaration of John Grobler. NEPA's procedural requirements are specifically designed to protect such particularized interests. *See, e.g.*, *Nat'l Wildlife Fed'n*, 497 U.S. at 886 ("We have no doubt that recreational use and aesthetic enjoyment are among the *sorts* of interests [NEPA was] specifically designed to protect."). If Defendants' had engaged in these procedures, they may have reached a different result that would have protected Grobler's interests, and—for standing purposes—this is all that is required. *See, e.g.*, *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) (stating that a plaintiff alleging a deprivation of a procedural right need not prove "that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result."). Thus, Plaintiffs have adequately alleged injury based on Defendants' violation of NEPA.

**V.   Intervenors' zone of interests argument is meritless.**

Intervenors allege that Plaintiffs' claims do not fall within the zone of interests of either the ESA or NEPA. *See* Int. Br. at 28–32. The "zone of interests" test requires plaintiffs to show that they "fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162. If the plaintiff's interests fall outside those protected by the statute, they may not invoke the cause of action created by the statute. *Lexmark Int'l Inc. v. Static Control Components*, 134 S.Ct. 1377, 1388–89 (2014). Though the Supreme Court and lower courts applied the zone of interests analysis as a jurisdictional matter for many years, the Supreme Court's recent decision in *Lexmark* did away

with this line of thinking. *Id.* at 1387. In *Lexmark*, the Supreme Court noted that "[a]lthough we admittedly have placed [the zone of interests] test under the 'prudential' rubric in the past, it does not belong there…." *Id.* (citations omitted). The Court went on to frame the proper zone of interests inquiry as whether the plaintiff "has a cause of action under the statute," noting "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter-jurisdiction, *i.e.* the court's statutory or constitutional power to adjudicate the case." *Id.* at 1387 & n.4 (citations omitted). In applying the Supreme Court's *Lexmark* ruling, the D.C. Circuit critiqued its own use of the zone of interests test:

> We have applied the prudential standing doctrine to intervenor-defendants under the theory that it was a 'jurisdiction[al] concept' on par with Article III standing. But the Supreme Court's decision in [*Lexmark*] makes plain the zone of interests test no longer falls under the prudential standing umbrella. Nor is it a jurisdictional requirement. Instead, the zone of interest test is now a merits issue.

*Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 320 (D.C. Cir. 2015) (internal quotations omitted). Thus, this Court should reject Intervenors' argument that it lacks jurisdiction because Plaintiffs do not fall within the relevant statutes' zone of interests.

Even if this Court were to consider Intervenors' zone of interest arguments, Plaintiffs' interests fall within the zone of interests for the relevant statutes. Plaintiffs' first, second, and third causes of action are brought pursuant to the APA. For APA causes of action, Plaintiffs must merely demonstrate their interests are "*arguably* within the zone of interests to be protected by the relevant statutory provisions." *Patchak v. Salazar*, 632 F.3d 702, 704 (D.C. Cir. 2011) (internal quotations omitted). The use of "arguably" in the zone of interests test communicates that the benefit of any doubt goes to the plaintiff. *Lexmark,* 134 S.Ct. at 1389. Thus, the test for determining whether a cause of action falls within the APA's zone of interests is "not meant to be especially demanding," and this "lenient approach" preserves the APA's flexibility as a judicial review provision. *Id.* at 1388–89.

Here, Plaintiffs have brought suit under the APA for violations of ESA Section 10, which

determines the relevant zone of interest. *See Bennett*, 520 U.S. at 175. Section 10 acts as a limited exception to the general prohibitions against the take of endangered species, but requires that any such exception be made for scientific purposes or to enhance the survival of the species. 16 U.S.C. § 1539(a)(1)(A). The purpose behind Section 10 is to "allow interested parties to comment on and assist the Secretary's evaluation of permit applications." *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 24 (D.C. Cir. 2011). Furthermore, this "opportunity for comment must be a meaningful opportunity." *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002). This being the case, Plaintiffs' interests are not only "*arguably* within the zone of interests to be protected by the relevant statutory provisions," but are the very same interests Section 10 seeks to protect. *Patchak*, 632 F.3d at 704.

Furthermore, Section 10's enhancement requirements are similar to the "best scientific and commercial data" requirements for the ESA listings discussed in *Bennett*, 520 U.S. at 176. There, the Court stated that the requirements acted to ensure that FWS did not "zealously but unintelligently" use the powers granted by the ESA, and held that the plaintiffs seeking to ensure FWS used the best data in their listing determination were within the zone of interests of the ESA. *Id.* at 177. Plaintiffs in this case seek to "police the interests" of the ESA in much the same way. *Amgen Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004).

This Court may also consider the ESA's overall purpose when determining the relevant zone of interests. *See Lexmark,* 134 S.Ct. at 1389. The ESA's purpose is to protect and conserve threatened and endangered species and the ecosystems they depend upon. *See* 16 U.S.C. § 1531(b) (stating ESA purposes). Plaintiffs' lawsuit seeks to protect endangered black rhinos, and Plaintiffs' members' interests are tied to black rhino protection. *See* Complaint at ¶ 12; *see also generally* Declaration of John Grobler. Congress plainly intended that the Endangered Species Act protect this interest related to protecting endangered species. *See, e.g.*, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996) (stating that protecting a threatened species is "certainly within any zone of interests contemplated by the ESA").

Additionally, Plaintiffs' fourth cause of action alleging that Defendants violated NEPA falls well within NEPA's zone of interests which is, simply put, "environmental" and "encompasses environmental values, read, of course, very broadly[.]" *Gunpowder Riverkeeper v. Fed. Regulatory Comm'n*, No. 14–1062, 2015 WL 4450952, at * 4 (D.C. Cir. July 21, 2015) (internal quotations omitted); *see also id.* (stating that a plaintiff "must assert an environmental harm in order to come within" NEPA's zone of interests). NEPA's wide environmental interest includes interests in endangered species; for example, NEPA's definition of "significantly" includes effects on endangered animals or their habitat, as determined under the ESA. 40 U.S.C. § 1508.27(b)(9). Here there is no question that Plaintiffs have asserted an environmental harm, and that Plaintiffs fall within NEPA's zone of interests. *See* Complaint at ¶ 12; *see also generally,* Declaration of John Grobler; *see also Nat'l Wildlife Fed.*, 497 U.S. at 886 (stating that it has "no doubt" that aesthetic enjoyment is among the interests NEPA was designed to protect).

Ultimately, Intervenors main argument is that Plaintiffs fall outside the zones of interest of the ESA and NEPA because Plaintiffs "oppose management use of animals" and that both the ESA and NEPA allow, and even (according to Intervenors) encourage, management of animals. *See* Int. Br. at 28–32. But in so arguing, Intervenors confuse the interests of the ESA and NEPA—protecting the environment and species—with how Intervenors believe that the ESA and NEPA protect those interests. The fact that Plaintiffs and Intervenors disagree about the best method to protect endangered species is irrelevant to whether Plaintiffs' interests are protected by the statutes. Plaintiffs' interests in protecting black rhinos plainly fall within the zone of interests of the ESA and NEPA.

## VI.   Plaintiffs are not subject to the ESA's 60-day notice requirement.

Intervenors further allege that Plaintiffs did not comply with the notice requirements of the ESA. Intervenors quote ESA's citizen suit provision as follows:

> No action may be commenced under … this section prior to sixty days after written notice has been given to the Secretary.

Int. Br. at 35 (quoting 16 U.S.C. 1540(g)(2)(C)). But in an attempt to tailor the law to their needs, Intervenors edited out a portion of the subsection inconvenient to their arguments. Without ellipses, the provision reads:

> No action may be commenced under *subparagraph (1)(C) of* this section prior to sixty days after written notice has been given to the Secretary.

16 U.S.C. § 1540(g)(2)(C) (emphasis added). Viewed in its entirety, section 1540(g)(2)(C)'s notice requirement is plainly limited to subparagraph (1)(C), which states that any person may commence a civil suit on his own behalf "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty *under § 1533 of this title* which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C) (emphasis added). Plaintiffs do not allege any violations of § 1533, which deals with the listing of species as threatened or endangered. Including the language deliberately omitted by Intervenors changes the effect of the provision and rebuts Intervenors' misleading arguments regarding notice.

While other ESA citizen suit provisions require Plaintiffs to provide notice for other types of claims as well, Intervenors do not argue that these provisions apply here. And this is for good reason. Subsection B, like subsection C, limits itself to claims under certain ESA sections; none of Plaintiffs' claims fall under these sections. *See* 16 U.S.C. § 1540(g)(1)(B). Subsection A allows for citizen suits "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). But according to the Supreme Court, subsection A does not allow for suits against the Secretary, elsewise subsection C would be superfluous. *Bennett*, 520 U.S. at 173. Further, subsection A allows for suits arising from "violations" of the ESA, which result in civil and criminal punishments. *Id.* The Supreme Court has stated that subjecting the Secretary to those kinds of punishments for "maladministration" in "implementation" did not make sense. *Id.* Thus, the court held that a § 1536 claim could not be

brought under subsection A. *Id.* Since the Court had concluded plaintiffs could not bring the §
1536 claims under the ESA citizen suit provision, they instead decided that relief was available
under the APA. *Id.* The APA provides review when no other remedy exists in court and nothing
in the ESA's citizen suit provision precludes APA review. *Id.*

The Section 10 claims before this Court are no different than those brought in *Bennett.* As
implementation and not violation claims against the Secretary for duties outside subsections B
and C, the ESA citizen suit provision provides no relief. Section 10 pertains only to the Secretary
and does not regulate private entities*;* it is an administrative provision. *See Sierra Club v.
Salazar*, 961 F. Supp. 2d 1172, 1179 (W.D. Wash. 2013). It makes no more sense to subject the
Secretary to civil and criminal penalties under subsection A for issuing faulty permits than it
does for poorly designating critical habitat as was the case in *Bennett*. *See id.* at 1179–80 (noting
that such a "result is counter to common sense"). Plaintiffs must seek redress under the APA.

There have been numerous cases, in both the D.C. Circuit and others, in which
plaintiffs—including the Intervenors in this case—brought ESA Section 10 claims under the
APA. For example, in *Gerber v. Norton*, the D.C. Circuit, reviewing under the APA, found that
FWS failed to publish critical information relating to the Section 10 permit and failed to make
mandated findings regarding minimization of impact. 294 F.3d 173, 178–79 (D.C. Cir. 2002).
Additionally, Intervenors in the present case brought their own Section 10 claims in
*Conservation Force v. Salazar* under the APA. 851 F. Supp. 2d 44 (D.D.C. 2012). After a
detailed discussion of *Bennett* and its application to Section 10, the court in *Sierra Club v.
Salazar* found that plaintiffs had properly brought their Section 10 claim under the APA and thus
were not subject to the 60-day notice requirement of the ESA.[21] 961 F. Supp. 2d 1179–80 (also
mentioning courts from the D.C. and Eleventh Circuits had applied the APA to Section 10
claims. *Id.* at 1181. The same is the case here.

---

[21] The 60-day notice requirement under the ESA's citizen suit provisions do not carry over to
claims brought under the APA, which does not have its own 60-day notice requirement. *See
Sierra Club v. Salazar*, 961 F. Supp. 2d at 1181.

**VII.     The Motion to Dismiss the Third Cause of Action Should be denied.**

   **A.  Plaintiffs' third cause of action challenges reviewable final agency.**

Defendants and Intervenors argue that Plaintiffs' third cause of action, challenging FWS's policy and repeated practice of issuing permits authorizing the importation of trophy-hunted rhinos from Namibia, does not constitute reviewable final agency action under the APA. Defendants attempt to misconstrue Plaintiffs' claim as a challenge to the agency's general day-to-day activities or broad permitting program. Def. Br. at 20. Intervenors' arguments mirror Defendants. *See* Int. Br. at 32-34. Plaintiffs do not dispute that courts should not intervene in the general day-to-day operations of the agency or review broad programmatic attacks unaccompanied by specific agency action. However, Plaintiffs challenge a discrete policy and final permitting actions. Specifically, Plaintiffs challenge FWS's policy that those who hunt endangered black rhinos in Namibia can import their trophies when they come back to the United States. Moreover, Plaintiffs' challenge includes specific action taken pursuant to this policy—the issuance of permits to Mr. Luzich and Mr. Knowlton.

According to the Supreme Court, there are two conditions of final, judiciable, agency action: (1) the action must mark the consummation of the agency's decision-making process; and (2) the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett*, 520 U.S. at 78. Here, FWS's policy allowing the importations of black rhino hunting trophies is final and the policy determines the rights of those with an interest in the permitting process and rhinos in Namibia.[22] Thus, the Court should not dismiss this claim before seeing the administrative record or hearing the merits. At a minimum, Plaintiffs have a right to receive the administrative record relating to the formulation of FWS's policy and decisions. *See Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1273 (D. Colo. 2010) ("Petitioners have clearly articulated a permissible challenge to the substantive

---

[22] Although FWS retains discretion to deny a permit, this does not change the fact that the agency made a final, reviewable decision. *Nat'l Ass'n of Home Builders,* 417 F.3d 1272, 1279-82 (D.C. Cir. 2005).

policy articulated in the Memorandum Opinion and may seek documents related to the formulation of that document.").

> **1.  FWS's permits and policy represent the consummation of the agency's decision-making process.**

As an initial matter, when a party challenges an agency's affirmative policy or act under the APA, the action is presumptively reviewable. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282. Moreover, "[t]he finality inquiry is a 'pragmatic' and 'flexible' one." *Id.* at 1279. As the First Circuit noted, "[a]n interpretation of § 706(2)(A) that does not include an agency's practice, ... would prevent a court from setting aside those unlawful acts and practices that reveal themselves only over time—that emerge from a 'pattern'—the very sort of unlawfulness that courts ... often find themselves best suited to handle." *NAACP v. U.S. Dep't of Hous. & Urban Dev.*, 817 F.2d 149, 160 (1st Cir. 1987) (internal quotations omitted). Nor does it matter if the "practice at issue is informal, rather than articulated in regulations or an official statement of policy." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. 1988); *see also M&T Mortg. Corp. v. White*, 2006 U.S. Dist. LEXIS 1903, *24, 2006 WL 47467 (E.D.N.Y. Jan. 9, 2006) (allowing plaintiff to proceed with APA claim against agency's practice of "rubber-stamping" insurance applications).

Here, Defendants and Intervenors erroneously direct the Court to cases where plaintiffs challenged agencies' failure to act under the APA Section 706(1). *See* Def. Br. at 21 (citing *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001); *Del Monte Fresh Produce v. United States*, 706 F. Supp. 2d 116, 119 (D.D.C. 2010); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66-67 (2004) (hereinafter, "*SUWA*"); *see also* Int. Br. at 32-33 (same). These cases are inapposite because "a party seeking to challenge an agency's failure to act faces a different burden from that borne by a challenger of agency action." *Nat'l Ass'n of Home Builders,* 417 F.3d at 1280. For example, in *SUWA*, the Supreme Court found that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it

is *required to take*." 542 U.S. at 64 (emphases in original). The Court went on to dispose of the plaintiff's claim on the second requirement: that the agency action was not "legally required." *Id.*

Unlike cases cited by Defendants and Intervenors, Plaintiffs do not challenge FWS's failure to act as unreasonable under APA section 706(1); instead, Plaintiffs challenge FWS's policy and repeated issuance of permits under APA section 706(2)(A). FWS issued publically-available statements regarding its policy allowing the importation of black rhino hunting trophies from Namibia.[23] Specifically, FWS made a final decision and declared that Namibia's program qualifies for hunting trophy imports. *Id.; see also* Intervenors Mem. of Law in Supp. of Mot. to Intervene, Dkt. 4–1 at 14 (claiming that FWS has already agreed that hunters can import rhino trophies, and the issuance or permits is "a battle already won" for trophy hunters so that they do not need to "re-prove" they are entitled to future permits unless Plaintiffs succeed in this case).

Defendants and Intervenors also erroneously categorize Plaintiffs' challenge as broad attack on FWS's ongoing permitting process and daily activities. However, FWS's statements, along with its pattern of issuing permits, evidences its final decision and legal interpretation that the importation of black rhino hunting trophies from Namibia is consistent with the ESA. Plaintiffs' claim does not interfere with ongoing decision-making process because FWS has already issued final permits pursuant to this policy. No further factual development of FWS policy is needed to adjudicate Plaintiffs claim. As such, FWS's action is reviewable under the APA. *See Nat'l Ass'n of Home Builders,* 417 F.3d at 1282 (rejecting agency's claim that its nationwide permits are unreviewable as a broad discretionary program and finding that final agency action occurred regardless of whether agency retained discretion to make individual permitting decisions on a case-by-case basis); *see also Robishaw Eng'g, Inc. v. United States,* 891 F. Supp. 1134, 1151 (E.D. Va. 1995) ("agency action' includes an agency's legal interpretations.").

---

[23] *See* FWS International Affairs, Black Rhino Import Permit from Namibia, Questions & Answers, available at http://www.fws.gov/international/permits/black-rhino-importpermit.

2.      **FWS's policy authorizing hunters to import black rhino hunting trophies from Namibia determines the rights of those interested in Namibian rhinos.**

The direct and immediate consequence of FWS's policy is the killing of rhinos in Namibia and the importation of their trophies. *See e.g.* Knowlton Dec. at ¶ 15 ("I would not have purchased the hunt without the promise of an import permit."); *see also Fund for Animals,* 322 F.3d at 73 (finding that FWS's policy of issuing permits allowing hunters to import argali sheep trophies would have legal consequences for those with an interest in the sheep). Moreover, Intervenors agree that FWS's policy has legal consequences. Intervenors Mem. of Law in Supp. of Mot. to Intervene, Dkt. 4-1 at 17 (arguing its members have significant interest in FWS's permitting policy and that they will continue to hunt black rhinos as long as FWS's policy is not undone). Because Plaintiffs have shown that FWS's policy on the importation of rhino trophies from Namibia is final agency action with legal consequences, the Court should hear the merits of this claim.

3.      **Defendants and Intervenors' reliance on *PETA* is misplaced.**

Finally, Defendants and Intervenors cite *People for the Ethical Treatment of Animals v. FWS*, 59 F. Supp. 3d 91 (D.D.C. 2014) (hereinafter, "*PETA*") to argue that there is no final agency action here. Defendants claim that *PETA* "is virtually identical to count III in this case." Def. Br. at 22.  However, there are several critical distinctions between *PETA* and the issues in this case.

First, *PETA* did not address the same issues or arguments that Defendants make in this case. Namely, Defendants rely on *PETA* to support their argument that here there is no final agency action. However, the *PETA* court did not even discuss final agency action. Defendants point to the court's analysis of whether PETA's claims were either moot or ripe for judicial review, issues not applicable or raised in this case.[24]

---

[24] "The ripeness requirement is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry*

Second, the facts in *PETA* make it inapplicable to the current case. In *PETA,* the plaintiff did not present any evidence of permits issued pursuant to the challenged policy, nor did it provide evidence—such as the agency's own website and documents—that indicated a policy existed. *Id* at 98–99. Additionally, in *PETA* FWS presented sworn declarations and argued that it had no such policy. *Id.* Accordingly, the court found that PETA's pattern and practice claim was not ripe for review. *Id.* at 99. In contrast, here Defendants have not disputed the policy of issuing permits to import rhinos hunted in Namibia, nor do they dispute FWS's pattern of issuing these permits. To the contrary, FWS admits that it issued such permits and has indicated that it will continue to do so.[25]

Finally, the *PETA* court explained that PETA's pattern and practice claims would be judiciable if PETA had more evidence of an actual pattern of impermissibly issuing permits. *Id.* at 99. The court explained "if FWS really does have a pattern and practice of doing what PETA accuses it of doing, then another case will inevitable arise ... with the assurance of repeated individual actions by FWS of this nature would inevitably become typical enough to satisfy the capable of repetition, yet evading review standard." *Id.* at 99. Here, Plaintiffs have shown exactly what the court requested in *PETA*, a repeated pattern of impermissibly issuing permits along with actual statements from FWS substantiating its policy to issue permits authorizing the importation of trophy hunted endangered rhinos from Namibia. Thus, this Court should reject Defendants' arguments and find that Plaintiffs' third cause of action states a claim for which this Court can grant relief.

---

*Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citation omitted). As discussed above, the policy here is final and has been implemented through specific permits, so it is ripe for judicial review.

[25] *See* FWS, Service Announces Decision on Import of Sport-Hunted Trophies to Further Conservation of Rhinos and Elephants, *available at* http://www.fws.gov/news/ShowNews.cfm?ID=56D54860-AEA6-0EEE-73467FE9B00499F0 (discusses its findings on Namibia's rhino management strategy and indicated it would issue more permits as allowed by the CITES-approved quota).

**B.      Defendants' policy is challengeable as the source of individual permitting decisions.**

In the alternative to challenging FWS's policy on its own, Plaintiffs can also challenge an agency's illegal pattern or practice where the agency's action indicates a repeated policy rather than isolated mistakes by agency officials. *See Payne Enters.,* 837 F.2d at 491; *see also Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 140 (D.D.C. 2013). Courts can review agency-wide practices when they relate to specific agency actions. *See Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002).

Defendants and Intervenors erroneously rely on cases against broad programs to argue that Plaintiffs' claim in not justiciable. Def. Br. at 20 (citing *Lujan v. Defenders of Wildlife*, 497 U.S. at 899). In *Lujan*, the Supreme Court found that there was no final agency action because plaintiffs' challenge, unlike here, did not "refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations" but instead challenged "the continuing operations of the BLM." *Id.* at 890. The Court explained:

> a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Id.* at 891 (internal citations omitted).

In contrast to the broad challenges at issue in *Lujan*, Plaintiffs are requesting that the court review Defendants' specific policy of allowing the importation of black rhino hunting trophies from Namibia, as well as two permits recently issued pursuant to such policy. Plaintiffs are not seeking wholesale improvement of FWS's ESA permitting program. Thus Defendants' reliance on *Lujan* is misplaced.

Intervenors argue that regardless of individual final permitting decisions, Plaintiffs still cannot challenge the agency's policy sanctioning these permits. *See* Int. Br. at 32–33. Intervenors cite a case from the Fifth Circuit, *Sierra Club v. Peterson*, in which plaintiffs challenged three decades of Forest Service timber-management practices in Texas. 228 F.3d 559, 562-64 (5th Cir.

2000). This case is not binding on this Court, nor is it factually or legally analogous. In *Peterson*, the plaintiffs' challenge to a Forest Plan encompassed over a half-dozen statutes and over one dozen regulations. *Id.* at 564-65 n.8. While the plaintiffs in *Peterson* included some examples of actions taken under the forest plan, they did not challenge any specific decision. *Id.* at 65-66. The Fifth Circuit concluded that the APA and *Lujan* barred their claim because plaintiffs had not "actually challenged a specific final agency action." *Id.* at 561, 565-66. Intervenors in this case attempt to use *Peterson* to argue that one can *never* challenge a plan or policy. However, the Supreme Court has indicated that the Intervenors reading of this case is inappropriate. *See Ohio Forestry Ass'n*, 523 U.S. at 734 (finding that plaintiff can bring challenge to forest wide management plan "at a time when harm is more imminent and more certain. Any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, i.e., if the Plan plays a causal role with respect to the future, then-imminent, harm from logging."); *see also Fed. Forest Res. Coal. v. Vilsack*, 2015 U.S. Dist. LEXIS 55070, *11, 45 ELR 20083 (D.D.C. 2015) ("Once the Forest Service decides to authorize a project pursuant to these three planning stages, the agency's decision [planning rule for all land managed by Forest service] is subject to judicial review pursuant to the Administrative Procedure Act."). Thus, Plaintiffs can challenge a policy when, like here, they demonstrate standing and that the policy impacts their concrete interests.

Moreover, unlike in *Peterson*, Plaintiffs' challenge is limited to a specific policy: FWS's issuance of permits under ESA Section 10(d) to hunters importing black rhino trophies from Namibia. Also, Plaintiffs' challenge is accompanied by challenges to specific permits issued to Mr. Luzich and Mr. Knowlton. Claims challenging an agency policy and the implementation of that policy through discrete agency action are reviewable in Federal Courts. *Swan View Coal. v. Dep't of Agric.*, 24 F.3d 1421, 46 (D.D.C. 1999) (finding declaratory relief appropriate "when a plaintiff challenges not just an isolated action, but also an allegedly illegal agency policy and the future implementation of that policy"). It is "well established" that a plaintiff can challenge "both

a specific agency action and the policy that underlies that action" and such a challenge remains judiciable even if the claim regarding the particular agency action becomes moot. *City of Houston. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994).

**VIII.   Conclusion**

For the foregoing reasons, this Court should deny Defendants' and Intervenors' motions to dismiss.


Dated:  September 4, 2015                    Respectfully Submitted,

s/ Michael Harris
Michael Ray Harris (DC Bar #CO0049)
Director, Wildlife Law Program
Friends of Animals
Western Region Office
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO
720-949-7791
michaelharris@friendsofanimals.org

s/ Jennifer Barnes
Jennifer Barnes (DC Bar # CO0056)
Associate Attorney
Friends of Animals
Western Region Office
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO
720-949-7791
jenniferbarnes@friendsofanimals.org


s/ Kevin M. Cassidy (*application for admission pending*)
Kevin M. Cassidy (MA BBO# 681301)
Senior Staff Attorney
EARTHRISE LAW CENTER
P.O. Box 445
Norwell, MA  02061
Tel: (781) 659-1696
Email: cassidy@lclark.edu
Fax: (503) 768-6642

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing **Plaintiffs' Consolidated Response to Defendants' and Intervenors' Motions to Dismiss** was served upon all counsel of record through the ECF system this 4th day of September 2015.

/s/ Jennifer Barnes