**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
FRIENDS OF ANIMALS, *et al.*,               )
                                            )
                    Plaintiffs,             )
                                            )
        v.                                  )         Civil Action No. 15-0653 (ABJ)
                                            )
DANIEL M. ASHE, *et al.*,                   )
                                            )
                    Defendants.             )
_____)

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Friends of Animals and the Zimbabwe Conservation Task Force have brought this action against federal defendants Daniel Ashe, Director of the U.S. Fish and Wildlife Service ("FWS" or "the Service"), and Sally Jewell, U.S. Secretary of the Interior.  They challenge the decision by the Service to issue permits authorizing two American hunters to import the trophies they garnered in legal hunts of black rhinoceros in Namibia.  Plaintiffs contend that the issuance of the permits violated the Administrative Procedure Act, the Endangered Species Act, and the National Environmental Policy Act.  Am. Compl. [Dkt. # 5].  The Ministry of Environment and Tourism of the Republic of Namibia, which licensed the hunts, and the Dallas Safari Club and Conservation Force, the organizations that helped the hunters obtain the challenged permits, have all intervened in the case as defendants.

The federal defendants and the intervenors have moved to dismiss the case on the grounds that plaintiffs lack standing and that several of their counts fail to state a claim.  While it is undisputed that the black rhinoceros is an endangered animal in need of the world's protection, plaintiffs have failed to show that they have standing to pursue their claims, and the Court will

1

grant the motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil

Procedure 12(b)(1).  Furthermore, Count III also fails because it does not identify a final agency

action subject to challenge under the APA.

## BACKGROUND

Both international convention and U.S. law govern the importation of endangered species

and the hunting trophies at issue in this case.

## I.      Legal Framework

### A.      The Convention on International Trade in Endangered Species of Wild Fauna and Flora

The Convention on International Trade in Endangered Species of Wild Fauna and Flora,

Mar. 3, 1973, 27 U.S.T. 1087 ("CITES"), is a multilateral treaty that regulates the international

trade of protected wildlife, including the black rhinoceros.  Both the United States and Namibia

are signatories to the treaty.  CITES categorizes covered species into three appendices depending

upon the level of protection the species requires, and it sets restrictions on their import and export.

The black rhinoceros falls under Appendix I of CITES, which applies to "all species threatened

with extinction which are or may be affected by trade."  CITES, Art. II(1).

Before a member country may import an Appendix I species, CITES requires the importing

country, among other things, to make a determination that "the import will be for purposes which

are not detrimental to the survival of the species."  CITES, Art. III(3)(a); Am. Compl. ¶ 33.

Correspondingly, the exporting country must make the same determination with respect to the

export.  CITES, Art. III(2)(a).

Pursuant to the treaty, signatories establish country-by-country provisions governing the

trade of specific species.  CITES signatories adopted a resolution in 2004 that set an annual export

quota of five hunting trophies of adult male black rhinoceros from Namibia.  Resolution Cong. 13.5 (Rec. CoP14), http://www.cites.org/eng/res/13/13-05R14C15.php.[1]  There is no claim in this case that this limit has been exceeded.

### B.      The Endangered Species Act

The Endangered Species Act is a U.S. law that seeks to conserve endangered and threatened species, 16 U.S.C. § 1531, and implements the CITES treaty through U.S. law.  *Id.* §§ 1537a; 1538(c).  The Act authorizes the Secretary of the Interior to list species as "threatened" or "endangered."  16 U.S.C. § 1533.  FWS, to which the Secretary has delegated the authority for administering the Act,[2] has listed the black rhinoceros as "endangered."  Endangered and Threatened Wildlife and Plants; Endangered Status for the Black Rhinoceros, 45 Fed. Reg. 47,352 (July 14, 1980).

The Act makes it unlawful to "take" – defined as, to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19) – any listed species "within the United States or the territorial sea of the United States" or "upon the high seas."  *Id.* § 1538(a)(1)(B)–(C).  The Act also prohibits the import or export of endangered species to or from the United States, except under certain circumstances.  16 U.S.C. §§ 1538(a)(1)(A); 50 C.F.R. § 17.21(b).  One of those circumstances is if the import or export

---

1      The Resolution set the same annual quota for black rhinoceros from South Africa. Resolution Cong. 13.5 (Rec. CoP14).

2      The Department of Interior's Fish and Wildlife Service is responsible for administering the Act for terrestrial and freshwater species, and the Department of Commerce's National Marine Fisheries Service is responsible for administering it for most marine species.  50 C.F.R. § 402.01(b); *Humane Soc'y of the U.S. v. Pritzker*, 75 F. Supp. 3d 1, 6 (D.D.C. 2014), *appeal dismissed*, No. 15-5038, 2015 WL 1619247 (D.C. Cir. Mar. 17, 2015).

would "enhance the propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).

The Service may issue permits authorizing the import of endangered species under this provision

if it makes the necessary enhancement finding.[3]  *Id.*  Before doing so, it must publish notice in the

Federal Register of each application for an import permit and allow interested parties to submit

objections.  50 C.F.R. § 17.22.

## II.    The Challenged Permits

Pursuant to Namibia's annual export quota under the CITES treaty, Namibia's Ministry of

Environment and Tourism ("the Ministry") may issue up to five sport-hunting licenses for black

rhinoceros per year.  Decl. of Malan Lindeque ("Lindeque Decl."), Ex. 1 to Mot. to Dismiss for

Lack of Jurisdiction by Intervenors [Dkt. # 18] ("Intervenors' Mot.") ¶ 9.  The Ministry, which is

responsible for the "management, protection and recovery" of Namibia's black rhinoceros

population, authorizes limited hunts "to remove older post reproduction bulls" or "problem

animal[s]" that "disrupt[] or threaten[] the herd."  Lindeque Decl. ¶¶ 2–3, 9–10.  The Ministry

charges fees for the sport-hunting licenses it issues, and the fees are deposited into Namibia's

Game Products Trust Fund.  *Id.* ¶¶ 13–14, 16.  This fund pays for black rhinoceros conservation

projects approved by the Fund's Board, such as "law enforcement and anti-poaching, community

benefits, and surveys."  *Id.*; *see also* Decl. of Simeon N. Negumbo, Ex. 2 to Intervenors' Mot. ¶ 4.

Namibia's decision to issue a hunting license does not depend on whether the United States

will authorize the import of the trophy.  Lindeque Decl. ¶ 11 ("Whether the United States allows

the import of black rhino trophies from Namibia has no effect on [the Ministry's] decision to certify

---

3    The Service is also responsible for making the determination required by CITES that the import "will be for purposes which are not detrimental to the survival of the species.  *See* 50 C.F.R. § 23.61(a).  This determination is not at issue in this case.

black rhino to be hunted or to offer up to five hunting licenses for black rhino annually.")  Indeed, the decision to authorize a hunt does "not depend on the involvement of hunters from any specific country or the issuance of an import permit by a foreign country."  *Id.*  The Ministry issues hunting licenses to citizens of countries other than the United States, and it has stated it will do so even if U.S. import permits are no longer issued.  *Id.*

In January 2014, the Dallas Safari Club, a hunting organization, held an auction for the right to conduct one of the Ministry's five rhinoceros hunts.  *See* Pls.' Consolidated Opp. [Dkt. # 21] ("Pls.' Opp.") at 7, citing Decl. of Corey Knowlton, Attach. 3 to Mot. to Intervene by Conservation Force and Dallas Safari Club [Dkt. # 4-10] ("Knowlton Decl.") ¶ 3.  Corey Knowlton, a member of both Dallas Safari Club and Conservation Force, won the auction with a bid of $350,000.  Knowlton Decl. ¶¶ 2–3, 5.  The hunt and bid were subject to numerous conditions, one of which was that the $350,000 would be transferred to Namibia's Game Products Trust Fund only if the U.S. Fish and Wildlife Service issued an import permit for the trophy.  Decl. of John Jackson, Attach. 2 to Mot. to Intervene by Conservation Force and Dallas Safari Club [Dkt. # 4-2] ("Jackson Decl.") ¶ 21; Knowlton Decl. ¶¶ 3, 5; Pls.' Opp. at 7.  Conservation Force agreed to help Knowlton obtain the permit, and on April 9, 2014, it filed an application with the Service on Knowlton's behalf for an import permit.  Jackson Decl. ¶ 26; Knowlton Decl. ¶ 8; Am. Compl. ¶ 64.  Separately, Conservation Force filed an import permit application on behalf of its

member Michael Luzich, who sought a permit for a trophy from a hunt he completed in 2013. Am. Compl. ¶ 64.[4]

The Service published notice of the permit applications in the Federal Register, *see* Endangered Species; Marine Mammals; Receipt of Applications for Permit, 79 Fed. Reg. 65,981 (Nov. 6, 2014), Am. Compl. ¶ 65, and plaintiff Friends of Animals submitted comments in opposition to the applications. Am. Compl. ¶¶ 9, 66. In March 2015, the Service advised Conservation Force that it would grant the two permits if the funds from Dallas Safari Club's auction were transferred to Namibia's Game Products Trust Fund. Jackson Decl. ¶ 28. Conservation Force wired the $350,000 to the fund in March 2015, Jackson Decl. ¶ 29, and the Service issued the import permits in April 2015. Am. Compl. ¶¶ 69, 72. Mr. Knowlton participated in the hunt and killed a black rhinoceros the following month, on or around May 19, 2015. Am. Compl. ¶ 73.

## III. Procedural History

On April 29, 2015, shortly after the Service issued the permits, Friends of Animals filed this lawsuit seeking to set aside the permits as unlawful. Compl. [Dkt. # 1] ¶¶ 1–2. On May 21, 2015, plaintiff amended its complaint to add the Zimbabwe Conservation Task Force ("ZCTF") as a plaintiff. Am. Compl. The amended complaint consists of four counts. In Count I, plaintiffs contend that the issuance of the permits was arbitrary, capricious, an abuse of discretion, and contrary to the law, in violation of the Administrative Procedure Act ("APA"). *Id.* ¶ 99. In Count II, plaintiffs maintain that defendants violated the APA by failing to publish their findings before issuing the permits. *Id.* ¶ 101. In Count III, they contend that defendants have improperly

---

4   The Luzich hunt was not associated with the Dallas Safari Club. Conservation Force agreed to represent Luzich in obtaining an import permit. Jackson Decl. ¶ 26 n.1.

adopted a "policy and repeated practice" of issuing import permits in violation of the Endangered Species Act and the APA. *Id.* ¶ 103–05. And in Count IV, they assert that defendants violated the National Environmental Policy Act ("NEPA") by failing to prepare an Environmental Assessment or an Environmental Impact Statement ("EIS") before granting the permits. *Id.* ¶ 107.

Conservation Force and Dallas Safari Club filed a motion to intervene so they could defend the Service's decision to issue the import permits to their members, which the Court granted on June 12, 2015. Mem. Op. & Order (June 12, 2015) [Dkt. # 9]. The Ministry also moved to intervene, and the Court granted that motion. Mem. Op. & Order (July 10, 2015) [Dkt. # 15].

On July 15, 2015, federal defendants moved to dismiss plaintiffs' action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and failure to a claim. Federal Defs.' Mot. to Dismiss [Dkt. # 17] ("Fed. Defs.' Mot."). The next day, intervenors moved to dismiss for lack of jurisdiction. Intervenors' Mot. The parties have fully briefed the motions. Pls.' Opp.; Fed. Defs.' Reply in Supp. of their Mot. to Dismiss [Dkt. # 23] ("Fed. Defs.' Reply"); Reply of Conservation Force, Dallas Safari Club, and Republic of Namibia, Ministry of Environment and Tourism [Dkt. # 24] ("Intervenors' Reply").

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139

(D.C. Cir. 2011).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## I.      Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.     Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79. A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556.

## ANALYSIS

To establish their standing to bring this action, plaintiffs must show three things: that they have suffered an injury-in-fact, that is, "an actual or imminent invasion of a legally protected, concrete and particularized interest;" that there is a causal connection between the alleged injury and the conduct at issue; and that it is likely, and not merely speculative, that the Court can redress the injury. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005), citing *Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992). Plaintiffs must demonstrate standing for each claim they assert. *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000).

Organizations such as plaintiffs may assert standing on their own behalf under certain circumstance or they may seek representational standing on behalf of their members. *Nat'l Ass'n*

*of Home Builders v. EPA,* 667 F.3d 6, 11 (D.C. Cir. 2011).   Plaintiffs here claim only representational standing, Pls.' Opp. at 13, n.12, so the Court will not address organizational standing.

To have representational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Ass'n of Home Builders,* 667 F.3d at 11, quoting *Ass'n of Flight Attendants-CWA*, 564 F.3d 462, 464 (D.C. Cir. 2009) and *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996).

Plaintiffs sue on behalf of themselves and their members.   Am. Compl. ¶¶ 6, 11.   Friends of Animals alleges that its members "travel to, and reside and work in Namibia, and . . . derive ongoing and lasting recreational, aesthetic, professional, moral, and spiritual benefits from observing black rhinos in their native habitat in Namibia." *Id.* ¶ 10.   Both plaintiffs claim that their "members are reasonably concerned that the issuance of permits to import sport-hunted endangered animals, such as the permits for black rhinos, will increase the world-wide demand for endangered animals and result in increased poaching and illegal trade." *Id.* ¶ 12.

According to plaintiffs, an increase in poaching resulting from the issuance of import permits would decrease their members' "opportunities to observe black rhinos and other endangered animals in the wild," and "their enjoyment when they do observe [them] will be decreased." Am. Compl. ¶¶ 12, 15.   Plaintiffs also allege that "the issuance of the import permits at issue here will lead to future and additional issuances of permits to import sport-hunted trophy parts to the United States." *Id.* ¶ 13.

Finally, plaintiffs claim that their injuries can be redressed by an order from the Court:

> [A]n order preventing the importation of endangered animal parts will discourage U.S. trophy hunters from killing endangered animals abroad and bringing them home to display as trophies. Such relief also will reduce the international transportation and trade of endangered animals. Because permits for endangered animal trophies contribute to a dual market for endangered animals and their parts, preventing the importation of such trophies will reduce supply and demand, and aid effective enforcement measures against the trade in endangered animals.

Am. Compl. ¶ 18.

## I.  Plaintiffs Do Not Have Standing.

### A.  Injury in Fact

The parties do not dispute that individuals may suffer an injury in fact when their aesthetic and recreational enjoyment of an area or wildlife is diminished. *Friends of the Earth, Inc.*, 528 U.S. at 183 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.")  But it is not enough to state that plaintiffs' members have a general interest in protecting the black rhinoceros or other endangered species.  The alleged harm must affect plaintiffs' members in a "personal and individual way." *Ctr. for Bio. Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (holding that the plaintiffs' concern that climate change would impact wildlife was too generalized and speculative to be concrete, imminent injury) (quoting *Defs. of Wildlife*, 504 U.S. at 560 n.1).

The Supreme Court has explained that in order to meet this requirement, plaintiffs must provide a "description of concrete plans," which includes establishing that they will "use the area affected by the challenged activity and not an area roughly in the vicinity of it," and when. *Defs. of Wildlife*, 504 U.S. at 565–66 (internal quotation marks omitted).

Federal defendants argue that plaintiffs' alleged "concern" and "fear" about diminished future opportunities to view black rhinoceros does not constitute injury in fact. Fed. Defs.' Mot. at 10. In response, plaintiffs have supplied a number of declarations,[5] only one of which asserts any actual plans to view black rhinoceros in Namibia. *See* Decl. of John Grobler, Ex. 1 to Pls.' Opp. [Dkt. # 21-1] ("Grobler Decl.").[6] John Grobler, a member of Friends of Animals who lives in Namibia, is a journalist who reports on "resource politics" in the country and has reported on issues concerning black rhinoceros specifically. Grobler Decl. ¶¶ 2–5. He has personally viewed black rhinoceros in the Kunene region of Namibia, and he avers that he last spotted one there in 1997. *Id.* ¶¶ 6, 13. More recently, he has traveled to the Kunene region "almost [e]very month since July 2014" to investigate rhinoceros poaching, but he has not seen black rhinoceros there, only occasional rhinoceros tracks. *Id.* ¶¶ 12, 13. Grobler states that black rhinoceros "are easier to spot in Etosha National Park than in the Kunene," and that he visited Etosha National Park in August 2015 to view rhinoceros but was unsuccessful. *Id.* ¶¶ 13, 14. He "intend[s] to return in the second week of September to the Kunene" to continue his investigations into poaching and other illegal hunting operations. *Id.* ¶ 12. Based on these facts, plaintiffs state that Grobler "lives in Namibia, where the endangered black rhinos live and are being killed by trophy hunters; he regularly visits the areas where black rhinos live and has plans to continue doing so; and he has

---

5       The Court may consider materials outside the pleadings as it deems appropriate to decide whether it has jurisdiction to hear the case. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

6       The others declarations describe the organizational work of Friends of Animals and of ZCTF and attach documents cited by plaintiffs in their opposition brief. *See* Decl. of Priscilla Feral, Ex. 2 to Pls.' Opp. [Dkt. # 21-2]; Decl. of Johnny Rodrigues, Ex. 3 to Pls.' Opp. [Dkt. # 21-3]; and Decl. of Michael Harris, Ex. 4 to Pls.' Opp. [Dkt. # 21-4].

observed black rhinos in the wild before in Namibia and hopes to able to continue to do so."  Pls.'

Opp. at 15–16.  They argue that this is enough to allege an injury in fact.  *Id.* at 15–17.

Federal defendants contend this does not establish that Grobler has "concrete plans" to "use

the area affected by the challenged activity" because the challenged permits were for imports from

hunts that were authorized for, and took place in, Mangetti National Park, and not either the

Kunene region or Etosha National Park.  Fed. Defs.' Reply at 5–6, quoting *Defs. of Wildlife*, 504

U.S. at 564–66 (explaining that Mangetti National Park is at least 250 miles from where Grobler

lives and at least the same distance from the Kunene region and Etosha National Park where he

has viewed rhinoceros in the past and plans to do so in the future); *see also* Intervenors' Reply at

6.

Plaintiffs maintain that Grobler's declaration is sufficient, and they point to a recent district

court decision on a motion to intervene to support their position.  Pls.' Opp. at 13, citing *Safari*

*Club Int'l v. Jewell,* No. 1:14-cv-00670-RCL, slip. op. at 6 (D.D.C. Mar. 12, 2015).  The *Safari*

*Club* case involved a challenge to a ban on the import of all trophies of African elephants from

Zimbabwe.  *See Safari Club Int'l v. Jewell*, 76 F. Supp. 3d 198, 202 (stating that in April 2014,

FWS announced the suspension of imports of legally sport-hunted elephants trophies from

Zimbabwe for the remainder of 2014).  Friends of Animals and the Zimbabwe Conservation Task

Force sought to intervene in that case to defend the ban, and the court concluded that they had

standing when it permitted them to do so.  *Safari Club*, slip. op. at 6.  The defendants opposed their

intervention on the grounds that the member who submitted a declaration stated only that he had

viewed elephants in the past, and therefore he did not "present the kind of future concrete intentions

needed for Article III standing."  *Id.*, quoting opposition to motion to intervene.  But the court

concluded that the member involved, who lived in Zimbabwe and performed conservation work

there, would suffer an injury in fact.  The court took note of the member's proximity to the affected elephants:  he did not need to specify future plans to go to Zimbabwe because he was already there, and he worked regularly with elephants.  *Safari Club*, slip. op. at 6–7.  So the injury in fact requirement was satisfied in that case because the declarant lived and worked in Zimbabwe where he regularly viewed and worked with elephants, and the challenged action affected elephants throughout the country.

Here, the challenged permits apply to trophies from two particular animals hunted in Namibia's Mangetti National Park in 2013 and 2015.  Am. Compl. ¶¶ 64, 73; MET Permit to Luzich to Hunt for Trophies [Dkt. # 22-1].  Grobler has not stated past or future plans to view rhinoceros in Mangetti National Park, so unlike the declarant in *Safari Club*, it is not clear that Grobler has any concrete plans to "use the area affected by the challenged activity," as opposed to some use an area "in the vicinity."  *See Defs. of Wildlife*, 504 U.S. at 564–66.  But since plaintiffs also allege – albeit conclusorily – that the import permits will affect not only the two deceased rhinoceros but also rhinoceros that may be hunted in the future, Am. Compl. ¶ 13, and assuming the Ministry has the power to authorize hunts throughout the country, *see* Lindeque Decl. ¶ 2, Grobler's plan to attempt to view rhinoceros in other regions in the future may give rise to the thinnest reed of an injury in fact.[7]  But even if it does, plaintiffs have not satisfied the causation and redressability prongs of standing.

---

7    This conclusion is based solely on the injury that would be suffered by a reduction in the number of rhinoceros to view; the Court need not reach the question of whether plaintiffs' somewhat dubious prediction that even if one of their members were to finally spot a rhinoceros, he or she would "not enjoy it as much" states an actual invasion of a concrete interest sufficient to confer standing.

### B.    Causation

To show causation, plaintiffs must demonstrate a connection between the alleged injury and the agency action at issue.  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d at 1157, citing *Defs. of Wildlife,* 504 U.S. at 560–61.   The connection between the two must not be overly attenuated or speculative, and the Supreme Court has warned that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is . . . ordinarily 'substantially more difficult' to establish."   *Id.* at 562, quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984).  When, as here, an element of standing

> depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, . . . it becomes the burden of the plaintiff to adduce facts showing that those choices . . . will be made in such manner as to produce causation and permit redressability of injury.

*Defs. of Wildlife*, 504 U.S. at 562; *see also United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) (rejecting allegations of causation that are "overly speculative," particularly those that involve "predictions of future events (especially future actions to be taken by third parties)").

The primary action challenged here is the Service's issuance of permits authorizing the import of trophies from two specific, completed hunts.  Am. Compl. ¶¶ 1, 13.  Plaintiffs' alleged injury is the reduction in their members' (or least one member's) "opportunities to observe black rhinos and other endangered animals in the wild" and a decrease in their "enjoyment when they do observe" them.  Am. Compl. ¶ 12.[8]   While plaintiffs recognize that it is Namibia that would

---

8    In Count III, plaintiffs purport to challenge permits to be issued in the future, but those challenges are not yet ripe and plaintiffs' generalized attack on agency "policy" does not state a claim.  *See* Section II *infra*.

authorize any hunt within its borders, they posit that there is a connection between the U.S. import

permits and the harms they fear they will suffer:

> Plaintiffs' injuries – brought on by the killing of black rhinos – are directly
> caused by Defendants' decision to issue permits for hunters to import black
> rhino trophies into the United States. . . .  While [the Ministry]'s decisions
> to issue permits to kill black rhinos could cause injury to Plaintiffs, it will
> do so only if hunters are willing to go there and pay to hunt rhinos. . . . [T]he
> majority of those seeking to hunt rhinos are Americans and are not willing
> to pay for the hunt if they cannot receive a permit to import the trophy back
> to the United States.

Pls.' Opp. at 17.

The Court holds that the alleged connection between the issuance of import permits for

trophies from completed legal hunts and a decrease in the opportunity to enjoy black rhinoceros in

the future is too attenuated and too dependent on the acts of third parties to supply the necessary

element of causation.  Even plaintiffs acknowledge that their injuries are "brought on by the killing

of black rhinos."  *Id.*  In other words, the direct cause of the feared reduction in the rhinoceros

population would be hunting, and the Service has no control over hunts in Namibia.  16 U.S.C.

§ 1538(a)(1)(B)–(C) (prohibiting the taking of endangered species within the United States, the

territorial seas of the United States, or upon the high seas).  Whether the Service issues an import

permit or not, the Namibian Ministry remains free to license hunts in accordance with international

law, and it has stated its intent to do just that.  Lindeque Decl. ¶ 11.[9]  And even if the Service were

to issue scores of import permits for sport-hunted black rhinoceros from Namibia, the import

---

9       Indeed, this is exactly what happened from 2004, when the CITES signatories authorized
the annual quota, until 2013, when the Service issued the first import permit.  *See* Pls.' Opp. at 7
(stating that the first time FWS had issued an import permit for a black rhinoceros trophy was in
2013); Lindeque Decl. ¶ 11 (stating that the Ministry offered hunter permits for black rhinoceros
before the first U.S. import permit was issued).

permits would have no effect whatsoever if the Ministry did not authorize the permittees to hunt. Thus, the Ministry – an independent third party not before this Court – stands in the middle of plaintiffs' chain of causation.

The Court recognizes plaintiffs' sincere commitment to the preservation of endangered animals, and this ruling does not suggest that there is no relationship between the importation of trophies of endangered species and protecting these species. The underlying premise of the CITES treaty and the Endangered Species Act is that regulating trade in protected species can serve as a means to protect them. *See* CITES, Art. II; 16 U.S.C. § 1538(a). But the relationship between the particular permits challenged here, which authorize the import of spoils of hunts that were entirely within Namibia's control, and plaintiffs' feared diminished enjoyment of black rhinoceros in Namibia in the future is too attenuated to confer standing on plaintiffs. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 509 (1975) (holding that the line of causation between an adjacent town's zoning ordinance and taxpayers' claimed injury of increased local taxes imposed by the authorities of Rochester, where they lived, was not apparent from the complaint and resulted only from the decisions of Rochester authorities, who were not parties to the case). Similarly, plaintiffs' conclusory suggestion that the agency's issuance of permits to particular hunters who obtained Namibia's permission to participate in one of Namibia's five legal hunts will embolden poachers also depends upon the actions of third parties who are not before the Court. Accordingly, the Court holds that plaintiffs have failed to allege facts sufficient to demonstrate causation.[10]

---

10    For these same reasons, plaintiffs do not have standing to pursue their NEPA claim. When asserting a claim for a violation of NEPA, plaintiffs must "demonstrate a causal connection between the agency action and the alleged injury." *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007). Plaintiffs complain that the Service did not issue an Environmental Assessment or EIS, but assuming it was required to do so in this circumstance, plaintiffs cannot link this omission to their claimed future injury.

### C.        Redressability

Plaintiffs also fall short in establishing the third element of standing.   To show redressability, it must be likely, and not merely speculative, that the Court can redress the claimed injury.   *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d at 1157, citing *Defs. of Wildlife,* 504 U.S. at 560–61; *see also Klamath Water v. Fed. Energy Reg. Comm'n,* 534 F.3d 735, 739 (D.C. Cir. 2008) ("In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'"), quoting *Utah v. Evans,* 536 U.S. 452, 464 (2002); *see also C-SPAN v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008).

Plaintiffs acknowledge this increased burden, but they point out that a plaintiff can demonstrate standing by showing that the choices made by the regulated third parties "have been or will be made in such manner as to produce causation and permit redressability of injury."  Pls.' Opp. at 11, quoting *C-SPAN*, 545 F.3d at 1054.  They contend that this Court can redress their claimed injuries because "[a]n order preventing the importation of endangered animal parts will discourage U.S. trophy hunters from killing endangered animals abroad . . . reduce international transportation and trade of endangered animals," discourage "a dual market for endangered animals and their parts," and "aid enforcement measures against trade in endangered animals." Am. Compl. ¶ 18.  According to plaintiffs, an order invalidating the two challenged permits and enjoining future permits would lead to fewer Americans killing black rhinoceros, thereby redressing the alleged injury to their members' interests in observing them. Pls.' Opp. at 2–3.

Defendants argue that "the outcome of this litigation cannot prevent anyone from hunting black rhinoceros in Namibia or anywhere else in Africa," so the injury is not redressable.  Fed.

Defs.' Mot at 18; *see also* Intervenors' Reply at 14.  The parties each cite separate decisions issued

in the same case, *Fund for Animals v. Norton*, to support their positions.  *See* Fed. Defs.' Mot. at

18–19; Mem. of Law in Supp. of Intervenors' Mot. [Dkt. 18-1] ("Intervenors' Mem.") at 23–24;

Pls.' Opp. at 21, 25.

In *Fund for Animals*, conservation organizations challenged the Service's issuance of

imports permits for trophies of argali sheep that were killed in hunts authorized by the governments

of Kyrgyzstan, Mongolia, and Tajikistan.  In deciding cross-motions for summary judgment, the

district court ruled that the plaintiff organizations lacked standing because they had not shown

redressability:

> FWS' import permits . . . do not authorize the killing of argali . . . .  Instead,
> it is the governments of Kyrgyzstan, Mongolia, and Tajikistan that authorize
> the hunting and killing of argali . . . .  [E]ven if the Service allowed no
> import permits, the three governments would remain as free as they now are
> to permit the sport hunting of argali in their own countries.

*Fund for Animals v. Norton*, 295 F. Supp. 2d 1, 7 (D.D.C. 2003), *appeal dismissed* No. 03-5373,

2004 WL 1562891 (D.C. Cir. July 9, 2004).  Defendants and intervenors assert that this same

reasoning should apply here. Fed. Defs.' Mot. at 18–19; Intervenors' Mem. at 23–24; Intervenors'

Reply at 12.

In an effort to avoid a similar outcome, plaintiffs cite an earlier ruling arising out of the

same litigation.  Pls.' Opp. at 21, 25, citing *Fund for Animals v. Norton*, 322 F.3d 728, 733–34

(D.C. Cir. 2003).  Before the district court ruled on summary judgment, it denied a motion to

intervene by the Mongolian government agency that authorized the argali hunts in that country.

322 F.3d at 731.  Mongolia appealed, and the Court of Appeals reversed.  It doing so, it held that

Mongolia had standing.

> The threatened loss of tourist dollars, and the consequent reduction in funding for Mongolia's conservation program, constitute a concrete and imminent injury. This injury is fairly traceable to the regulatory action – the placement of the argali on the endangered list and the cancellation of import permits – that the Fund seeks in the underlying lawsuit. And it is likely that a decision favorable to [Mongolia] would prevent that loss from occurring.

*Fund for Animals*, 322 F.3d at 733.

Plaintiffs submit that the Mongolia ruling supports their position on redressability: "[I]n finding intervenors' injuries redressable, the D.C. Circuit did not consider the fact that the foreign governments could continue to generate some money by selling hunting permits; instead, the D.C. Circuit found it sufficient that a court order favorable to the foreign governments . . . allowing American hunters to import argali sheep trophies . . . would redress the foreign governments' alleged injuries of reduced income from trophy hunters." Pls.' Opp. at 25. In other words, according to plaintiffs, the fact that Mongolia might still generate funds from other hunters did not undermine its argument that suspending import permits would harm the country and that a court order allowing permits would redress its harm. Therefore, plaintiffs contend, the fact that hunters can still kill rhinoceros in Namibia does not negate their claim that upholding the permits will harm their members' interest in viewing rhinoceros, and so, an order invalidating the permits would redress that harm.

Putting aside the question of whether this argument has any logical force in the case of the permit issued for the animal that had already been killed, the D.C. Circuit's decision did not turn on the question of whether the challenged permits would reduce Mongolia's revenues – a claim that the party opposing intervention did not dispute. *Fund for Animals*, 322 F.3d at 733. It turned on the conclusion that Mongolia's sheep were the subject of the challenged action: "if the complainant is an object of the action . . . there should be little question that the action or inaction

has caused his injury, and that a judgment preventing or requiring the action will redress it." *Id.*
at 733–34 (quotation marks omitted).  And though Mongolia was not itself the object of the agency
action, "sheep that Mongolia regards as its national property and natural resource plainly are its
subject." *Id.* at 734.  The Circuit Court saw "no meaningful distinction between a regulation that
directly regulates a party and one that directly regulates the disposition of the party's property."
*Id.*  Thus, it held that Mongolia, as the object of the challenged action, had standing.

But plaintiffs here do not stand in a position that is analogous to that occupied by the
country authorizing the hunting of the sheep;[11] instead their position is indistinguishable from that
of the conservationist plaintiffs who were ultimately found to lack standing at the summary
judgement stage.  *Fund for Animals*, 295 F. Supp. 2d at 7–8.  Plaintiffs recognize that they are not
the object of the permitting process, *see* Pls.' Opp. at 2, 9, 15, 17, but they argue that the choices
made by regulated third parties – in this case, the hunters – can "produce causation and permit
redressability of injury."  Pls.' Opp. at 11, quoting *C-SPAN*, 545 F.3d at 1054; *see also id.* at 25
(arguing their "members are injured when trophy hunters kill black rhinos, and these injuries are
fairly traceable to Defendants' decision to issue permits to hunters to import black rhinoceros
trophies").  But this ignores the role of the Ministry in authorizing any hunt and the fact that the
permitting process does not control foreign hunters or American hunters who do not seek to import
their trophies.  The Ministry has made clear it will authorize the hunting of black rhinoceros in

---

11      The Circuit Court found that Mongolia's national property was the object of the Service's
action, and the possible loss of hunters' fees and funds for its conservation programs was fairly
traceable to the challenged action and redressable by the court.  *Fund for Animals*, 322 F.3d at 734.
The analog to Mongolia in this case is Namibia:  the Service's action affects Namibia's national
property, the threatened loss of hunters' fees and reduced funds for its conservation programs are
fairly traceable to the relief that plaintiffs seek, and a decision favorable to Namibia would redress
that injury.  *See* Mem. Op. and Order [Dkt. # 15] at 4–5 (analogizing Namibia's position here to
Mongolia's in *Fund for Animals* and granting Namibia's motion to intervene).

accordance with CITES, the international treaty, whether FWS issues permits or not.  Lindeque Decl. ¶ 11.  So, as the district court held in *Fund for Animals*, 295 F. Supp. 2d 1, an order in plaintiffs' favor would not bring an end to the hunts or avert the harm to plaintiffs' members.  *See also Friends of Animals v. Jewell*, 82 F. Supp. 3d 265, 266–67, 276 (D.D.C. 2015) (rejecting argument that allowing hunting of captive antelope could likely lead to increased killing and poaching of wild antelope because any likelihood of increased efforts to hunt wild antelope remain the "unfettered choice[] of these third parties") (quoting *Defs. of Wildlife*, 504 U.S. at 562); *Cary v. Hall*, No. 05-cv-4363, 2006 WL 6198320, *1–2, 7–8 (N.D. Cal. Sept. 30, 2006) (following *Fund for Animals* and holding that redressability is not likely when the challenged agency is not the entity that authorizes the sport hunting).  Thus, the Court finds that even a favorable ruling in this case would not redress plaintiffs' alleged injuries.

Plaintiffs contend that they are not required to "show that a favorable decision will relieve . . . *every* injury," Pls.' Opp. at 25–26, quoting *Larson v. Valente*, 456 U.S. 228, 244 n.15 (2008), only that the "risk would be reduced to some extent if petitioners received the relief they seek." *Id.*, quoting *Massachusetts v. EPA,* 549 U.S. 497, 525–26 (2007).  According to plaintiffs, they do not need to show that a court order would protect all black rhinoceros in Namibia from hunters or even significantly reduce the risk that they will become extinct; they say they simply need to show that the risk of rhinoceros dying will be "reduced to some extent."  Pls.' Opp. at 26.  But, as explained above, there is no indication that an order from this Court would even accomplish that, much less that it would "significant[ly] increase" the likelihood that plaintiffs would obtain relief that redresses their injury.  *Klamath Water*, 534 F.3d at 739, quoting *Evans,* 536 U.S. at 464.  And neither case cited by plaintiffs stands for the proposition that a plaintiff can show redressability when a court order would not affect the alleged harm at all.  *See Larson*, 456 U.S. at 242–43

(holding that a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself); *Massachusetts*, 549 U.S. at 525–26 (holding that the plaintiffs showed redressability even though regulating motor-vehicle emissions in the United States would not by itself reverse global warming, because reducing domestic emissions would slow the pace of global emissions increases).

## II.    Count III Does Not Challenge an Agency Action or a Final Agency Action and is Not Ripe.

In Count III, plaintiffs allege that federal defendants have adopted a "policy and repeated practice of issuing permits to import sport-hunted trophies of endangered animals" in violation of the ESA and the APA.  Am. Compl. ¶ 105.  Federal defendants have moved to dismiss this count under Federal Rule of Civil Procedure 12(b)(6), and the intervenors also seek dismissal of the count on the basis that it is "not justiciable."[12]  *See* Fed. Defs.' Mot. at 20–23; Intervenors' Mem. at 32–34.

Section 702 of the APA provides judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  Section 704 provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  An agency's action is final if it 1) "marks the consummation of the agency's decisionmaking process" and 2) affects the "rights or obligations . . . [or the] legal consequences" of the party seeking review.  *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997); *Domestic Sec., Inc. v. SEC,* 333 F.3d 239, 246 (D.C. Cir. 2003).

---

12    Dismissal on the grounds of no final agency action under the APA is properly sought under Rule 12(b)(6) because "the APA grants a cause of action rather than subject matter jurisdiction." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n.4 (D.C. Cir. 2006).

The Supreme Court has held that a plaintiff may not use the APA to seek the "wholesale improvement of [a] program by court decree." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (stating that programmatic improvements are normally made in the offices of the agency or the halls of Congress). In *National Wildlife Federation*, the plaintiff challenged the Bureau of Land Management's "land withdrawal review program." *Id.* at 875. The Supreme Court found that the term "land withdrawal review program" did not refer to any specific agency orders or regulations, but that it embraced "the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans" as required by statute. *Id.* at 890. Therefore, the Court held, the challenged "program" was not an "agency action" under section 702, but rather comprised "1250 or so individual classification terminations and withdrawal revocations." *Id.*

The Supreme Court also held in *National Wildlife Federation* that the plaintiff had not challenged a "final agency action" under section 704 because the claim was not ripe for judicial review. "Under the terms of the APA, [a plaintiff] must direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891 (explaining that a regulation is normally considered "ripe" for review when the "scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the [plaintiff's] situation in a fashion that harms or threatens to harm him"). So even if the plaintiff were correct that the BLM's "land withdrawal review program" was flawed, the APA did not provide for judicial review of its operation as a whole; the statute only authorized judicial review on a case-by-case basis, after the agency had taken a "concrete action . . . in a

fashion that harm[ed] or threaten[ed] to harm" a claimant.  *Id.* at 891.[13]  Even the fact that some

claimants had ripe claims did not make the entire "program" reviewable:

> [T]he entire "program" – consisting principally of the many individual
> actions referenced in the complaint, and presumably actions yet to be taken
> as well – cannot be laid before the courts for wholesale correction under the
> APA, simply because one of them that is ripe for review adversely affects
> one of respondent's members.

*Id.* at 893.

The Court holds that Count III presents the type of broad challenge that the Supreme Court

rejected in *National Wildlife Federation.*  Plaintiffs seek judicial review not only of specific past

FWS permitting decisions but also of an alleged "policy" to grant import permits in the future.

Am. Compl. ¶¶ 13, 105.  So even if plaintiffs could satisfy the elements of Article III standing,

plaintiffs' objections to the Knowlton and Luzich permits do not give them a platform from which

they may request "wholesale correction" of the agency's permitting program.  *Nat'l Wildlife Fed'n*,

497 U.S. at 893; *see also Corbell v. Norton,* 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single

step or measure is reviewable, an on-going program or policy is not, in itself, a 'final agency action'

under the APA.").

Plaintiffs characterize Count III as challenging a "discrete policy" and not the agency's

day-to-day operations, and they argue that the "policy" is final and determines the rights of those

with an interest in the permitting process and rhinoceros in Namibia.  Pls.' Opp. at 36, citing

*Bennett*, 520 U.S. at 178.  But plaintiffs' prediction that the agency will issue import permits to

hunters in the future is not enough to establish an application of the challenged "policy" that causes

---

13      The exception to this rule is that a substantive agency action is reviewable if, as a practical
matter, it requires a party to adjust his or her conduct immediately.  *Nat'l Wildlife Fed'n*, 497 U.S.
at 891.  That exception does not apply here.

or threatens harm to a particular claimant. *Nat'l Wildlife Fed'n*, 497 U.S. at 891. Accordingly, plaintiffs' challenge involves neither an "agency action" under section 702, nor a "final agency action" under section 704, and any allegations about the future implementation of the Service's alleged "policy" are not yet ripe.[14] *See also People for the Ethical Treatment of Animals, Inc. v. FWS*, 59 F. Supp. 3d 91, 98–99 (D.D.C. 2014) ("*PETA I*") (dismissing case that alleged the Service applied an improper policy in issuing import permits under the Endangered Species Act because the court could not discern what the challenged policy was, and because the case was not ripe since it did not concretely affect the plaintiff); *People for the Ethical Treatment of Animals, Inc. v. FWS*, No. 1:15-cv-00600, 2015 WL 5474477, *1–2 (E.D. Va. Sept. 8, 2015) (dismissing case involving the same allegations as in *PETA I* because the challenged agency action was not a "final agency action" under the APA: a "[p]laintiff may not 'challenge an entire program by simply identifying specific allegedly-improper final agency actions within the program'"), quoting *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000).

---

14      This conclusion comports with the requirement under the APA that parties exhaust their administrative remedies before seeking judicial review. The Service's permitting decisions are made on a case-by-case basis, *see* 50 C.F.R. § 17.22, and so they are adjudications that require exhaustion. *Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012) (holding that the Service's decision to deny import permits for trophies from elephant hunted in Zambia was not ripe because the applicants had not exhausted their administrative remedies); *see also Franks v. Salazar*, 816 F. Supp. 2d 49, 59 (D.D.C. 2011).

## CONCLUSION

For the reasons stated above, the Court holds that plaintiffs do not have standing and that Count III fails to state a claim.   Accordingly, the Court will grant federal defendants' and intervenor defendants' motions to dismiss.   A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

Date:   March 24, 2016